SUSIE FREEMAN, Respondent, v. LOYAL PROTECTIVE INSURANCE CO., Appellant.

Kansas City Court of Appeals, May 21, 1917.

1. **INSURANCE: Death from Accidental Injury: Evidence as to Cause of Death: Burden of Proof.** In a suit by the beneficiary on a policy of insurance against death by accidental means, where the claim is that insured inhaled a bug which induced pneumonia and thereby brought on his death, the burden is on plaintiff to show not only that such accidental inhalation occurred but also that insured's death came from that cause rather than from disease caused otherwise. The cause of death cannot be left to conjecture.

2. ———: ———: ———: **Admissibility.** In a suit on an accident policy for death by accidental means, where the claim is that insured inhaled a bug which produced pneumonia from which he died, and there is no evidence showing with any degree of reasonable certainty that insured's death was caused by the inhalation except the doctors' opinion that it was, and they admit that if they had not been told of such inhalation, they could not say what was the cause of the trouble, the very life of plaintiff's case depends upon whether the testimony in relation to such inhalation is properly admissible under any exceptions to the hearsay rule.

3. ———: ———: ———: ———: **Opinion of Experts: Patient's Statement: Hearsay.** The evidence of plaintiff's experts as to insured's death from inhalation of a bug was not given in answer to hypothetical questions in which the truth of the claim of inhalation was assumed, nor was it based upon what they themselves found, but upon what the patient related to them concerning a past occurrence and in detailing his condition in the past. Such statements are hearsay, and the opinions of the experts based on them were improperly received.

4. ———: ———: ———: ———: ———: ———: ———: Res Gestae. The evidence that insured's death was caused by the inhalation of a bug consisted solely of statements made some time afterward by him to others. The circumstances under which they were made are considered and held not to be such as to make them admissible as a part of the *res gestae*.

Appeal from Howard Circuit Court.—*Hon. A. H. Waller,* Judge.

REVERSED.

*Ross J. Ream* and *Samuel C. Major* for appellant.

*Jasper Thompson* and *A. W. Walker* for respondent.

TRIMBLE, J.—Plaintiff is the beneficiary in a policy of accident insurance issued to her husband by the defendant company. Insured died while the policy was in force and defendant refused to pay. Thereupon this suit was brought resulting in a verdict and judgment for plaintiff in the full amount of the policy with interest, from which the defendant has appealed.

The petition alleged that in said policy defendant agreed to pay plaintiff the sum of $4000 if the death of J. M. Freeman, her husband, "should occur, while the policy was in force, as the result, alone and independently of all other causes, of bodily injuries occasioned by external violent and accidental means, leaving upon the body marks of contusion or wound visible to the eye." The answer admitted the execution of the policy and the death of the insured, but asserted that his death was occasioned by disease and not of a cause covered by the policy; also that insured did not sustain bodily injuries from external violent and accidental means which left upon the body marks of contusion or wound visible to the eye.

Freeman was going from place to place in Howard county driving a team and medicine wagon, engaged in selling medicines. On September 29, 1915, he spent

the night at the home of Frank Watts. He appeared to be in good health, ate heartily at both supper and breakfast and left Watts' home the next morning, September 30th, about eight o'clock. He drove from there about a mile to the home of R. H. Torbit, having to pass through a gate midway between the two places, and arrived at Torbit's somewhere between eight and nine o'clock. He began showing his medicines to Mrs. Torbit but exhibited difficulty in talking on account of coughing and hacking. To Mrs. Torbit he seemed to be in perfect health except that he coughed considerably and seemed to have some irritation in his throat. Over the objections and exception of defendant's counsel, Mrs. Torbit was asked the following questions and gave the following answers:

"Q. I will ask you to state to the jury what Mr. Freeman said to you was the trouble with him at the time he was talking to you? A. He said a bug flew into his throat and was causing him considerable discomfort.

"Q. Did he say anything about his condition? A. He said it seemed it would neither go down nor he couldn't get it up—could neither get it up nor down, is the way he expressed it.

"Q. State whether or not he indicated the location? A. It seemed it was in the throat here (indicating), is what he said, and would neither go up nor down."

From Mrs. Torbit's testimony, given elsewhere, it appears that Freeman said to her that the bug flew in his throat at the gate, and that he made the statement to her in excusing and explaining his coughing.

Insured then left the house and went out on the farm to see Mr. Torbit and returned in about two hours, but appeared then to be very sick, vomiting and having spells of coughing. He got into his wagon and drove away.

From Torbit's, insured drove about two miles to the home of Willard Liggett, arriving shortly after

196 M. A.—25

twelve o'clock.  Mr. Liggett met him on his way to the house after he had gotten out of his wagon.   Liggett noticed that he was pale but during the time he was with him did not observe any coughing.   Insured asked if he could lie down saying he was very sick.   This testimony was objected to by defendant, but the objection was overruled.   Thereupon, over the objections and exceptions of defendant to each, he was asked and answered questions as follows:

"Q. Did he state anything further about his condition?  A. He told me the cause of his condition.

"Q. What did he say?  A. He said he had got an insect in his throat or windpipe—I don't remember just the words he used—anyway, he said it seemed to stop somewhere down here (indicating on throat), and he couldn't get it up; that he had vomited and it didn't seem to remove the cause of the trouble; that it seemed to settle there; that he was getting sicker all the time, and that he would like to lie down awhile and see if that would help him."

Mr. Liggett remained at the house only about thirty minutes after insured came.   Mrs. Liggett testified that insured came in and was lying down for about two hours and complained of being very sick; that he vomited, complained of being sick at the stomach and of headache and backache.   She said his breathing at one time seemed a little unnatural but she did not hear him cough during the time he was there.   Over the objection and exception of defendant, she was allowed to state that insured said "it seemed like an insect had lodged in his throat" and that "he still felt like he could feel an insect or whatever it was in his throat—he vomited and couldn't get it up."

From Liggett's, insured drove to his home and Doctor Smith was called who arrived about six or seven in the evening.   This was September 30.  Dr. Smith found him suffering with a pain over his stomach and having fever.   He was not coughing.   He gave the doctor a history of his case.   The doctor did not examine his chest nor did he do so the next day or the day after

that as he appeared to be better for two or three days, and the doctor merely called in to see him when he was in the neighborhood visiting other patients. After that, however, either on the following Sunday or Monday about four days from the first day, the doctor found him complaining of pains in his chest and coughing some, and upon examination of his chest the doctor found evidence of a cavity in the lower lobe of the left lung. From that time on the doctor visited him every day and sometimes two or three times a day and examined his lungs fully. He says he found nothing except the cavity until about the 11th day when they found evidence of the beginning of pneumonia setting up in the lower lobe of the left lung; that there was no pneumonia in the right lung at that time and he had not found any signs of pneumonia prior to the 11th day. A few days later they found the upper lobe of the left lung was involved, and on the 16th of October the patient died. An autopsy disclosed that both lungs were affected with pneumonia. There was a cavity about four inches in diameter in the left lung from which the tissues had been destroyed and expectorated.

Dr. Lee, who was called in consultation on October 10th, saw deceased three times before he died. His testimony is that at the first time he saw the patient he did not have pneumonia but that there was an abscess or cavity in his left lung, that when he saw him two days later the cavity had enlarged and pneumonia was developing in that lung, and on the evening before his death on the 16th, the pneumonia had spread over the entire left lung and it was solidified and the patient was in a dying condition; that after death autopsies showed both lungs affected with pneumonia.

Both of these physicians testified for plaintiff, over the objections and exception of defendant, that in their opinion the probable cause of the pneumonia was the cavity or abscess they found in the lung and that it was caused by the inhalation of a bug or some foreign substance. No bug or foreign substance was found in the lung; and it is clear, from the testimony of the doctors,

that their conclusion that the cavity was caused by the inhalation of a bug or some foreign substance was based upon what the patient had told them in that regard. Their conclusions were reached "from the history of the case" and "from the history and symptoms of the case." Each of them admitted that, leaving out the history of the case and what they had heard, they could not tell what caused the cavity. There is no evidence as to how long this cavity had existed before it was discovered, though the doctors seem to have regarded it as of recent origin. But Dr. Smith said the cavity could have been there long before they found it and might have been there all of Freeman's life; and Dr. Lee said a cavity or abscess could be attributed to a tubercular trouble or something of that kind. There can be no question but that the opinions of the plaintiff's experts as to what caused the cavity were based upon the information imparted to them that a bug had flown into the patient's throat, and their testimony is that, had it not been for that information, neither they nor anyone else could have ascertained what caused the cavity or the illness.

Now, without passing upon the question, but assuming that if the original cause of insured's trouble was the inhalation of a bug or some foreign substance then his death was caused by an external violent and accidental means "which left upon the body marks of contusion or wound visible to the eye," so as to come within the terms of the policy, still it is clear that the burden is upon plaintiff to show not only that such accidental inhalation occurred but also that there is reasonable ground for thinking that insured's death came from that cause rather than from disease. The cause of his death cannot be left to conjecture. [Rogers v. Hammond Packing Co., 180 Mo. App. 227, 230; Farner v. St. Louis etc. R. Co., 178 Mo. 125, 134; Wright v. Order of United Comm. Travelers, 188 Mo. App. 457; Carnes v. Iowa State Travelling Men's Assn., 106 Iowa 281; Merrett v. Preferred Masonic etc. Assn., 98 Mich. 338.] Plaintiff's doctors say that they found no pneumonia until after

the cavity was found, but they also said that there were no uniform symptoms of pneumonia; that it sometimes commences with pains in the stomach, sick stomach, backache and always fever; that in "central" pneumonia or pneumonia affecting the central or deeper portion of the lobe of the lung, the sure indications of pneumonia might not develop for some days after the disease had really commenced. It will be observed that this corresponds with the symptoms of insured. So that really there is no evidence showing with any degree of reasonable certainty that insured's death was caused by the accidental inhalation of a bug or foreign substance, except the doctors' opinion that it was. And they admit that, if they had not been told of such inhalation, neither they nor anyone else could say what was the cause of the trouble. Without such information, they were unable to ascribe it to an accidental cause, certainly not to a cause producing death as the "result . . . of bodily injuries occasioned by *external* . . . *means,* leaving upon the body marks of contusion or wound visible to the eye," which was required both by the policy and the pleading. Plaintiff's expert evidence shows there were no marks of contusion or visible evidences of injury upon the outside of the body. The very life of plaintiff's case, therefore, hangs upon the questions whether insured's declarations to Mrs. Torbit and the Liggetts were admissible as a part of the *res gestae,* and whether the opinions of plaintiff's experts as to insured's illness and death from an accidental, *external* cause, were competent when it is certain that they could not have ascribed it to even an accidental cause if they had not been told that insured had inhaled a bug. Defendant not only objected to the evidence but moved to exclude it after it was given.

With reference to the opinions of plaintiff's experts as to insured's death being produced by an accidental, external cause, it should be observed, that they were not given in answer to hypothetical questions in which the truth of insured's inhalation of a bug or some foreign substance was assumed. Plaintiff's doctors testified to

visiting insured and to his condition throughout his illness and what the autopsy revealed and then testified that his illness was produced by the inhalation of a bug or some foreign substance. But their evidence discloses that this was based upon what the patient disclosed to them. In other words, that which they themselves ascertained from their own examination and experience did not reveal the cause to be from an accidental external source, but the patient told them he had inhaled a bug, they believed him and accepted it as true, and on that gave their opinion that the inhalation was the cause. On an issue such as this, however, the rule is that, when expert opinion evidence is not given under hypothetical questions, before the expert gives his opinion "he must first be shown to have a personal knowledge of the facts sufficient to enable him to form an opinion." [11 R. C. L. 577.] Now it is not contended that the declarations of the insured to his physicians were admissible as a part of the *res gestae.* The rule is that a physician may testify to statements of the patient relating to his condition *at the time,* but statements relating to a past condition or to circumstances surrounding the receiving of an injury or the manner in which it was received, are not admissible. [Brady v. Springfield Traction Co., 140 Mo. App. 421, 428; Poumeroule v. Postal Telegraph Co., 167 Mo. App. 533, 539; Holloway v. Kansas City, 184 Mo. 19, 39; National Masonic etc. Assn. v. Shryock, 73 Fed. 774; David v. Commercial Mut. Accident Co., 166 Ill. App. 490.] It is said in Holloway v. Kansas City, supra, that statements of a patient to a physician as to past physical condition are mere hearsay, and that the physician, in giving his opinion as an expert, cannot take such statements into consideration. Consequently, in the case at bar, the opinions of plaintiff's experts, being based upon hearsay, were inadmissible. But this will only necessitate the remanding and not a reversal of the case outright, if the declarations of insured to Mrs. Torbit and the Liggetts, as to having inhaled a bug, are admissible as a part of the *res gestae.* For, if those declarations

are admissible, then the plaintiff would be entitled to another trial at which she could submit the question of the cause of her husband's death to her experts on the hypothetical assumption that he had inhaled a bug or some foreign substance. So that a decision of the question whether said declarations are admissible will determine whether this case should be merely remanded for a new trial or reversed outright.

The declaration to Mrs. Torbit was made after insured had driven a half mile from the gate, where the inhalation is said to have occurred, and after he had entered the house and *had begun showing his medicines.* She said she saw nothing the matter with him, he appeared to be in perfect heatlh except that he coughed considerably. She first noticed his coughing when he began to talk and show his medicines. He was showing his medicines and he could hardly explain for coughing and hacking, and he apologized for it, and in doing so told her a bug flew in his throat. She says, "I guess he thought it necessary to make an explanation, because there was so much of it." Mrs. Torbit's husband was not very well and Mr. Freeman was saying he thought he had something to help him and went out on the place to see him. Now, it is well settled that declarations need not be contemporaneous with the exciting cause, nor can there be any general rule fixing a definite length of time as determinative of their admissibility. But where there is a lapse of time between the occurrence and the declarations, the latter must be made under circumstances which show that they are the spontaneous, unreflecting, instinctive impulse generated by some physical shock, stress of nervous excitement, or excited feeling which extends continuously and without abatement or dissipation from the moment of the occurrence to the time of the declaration in such full sway as to dominate the reflective faculties and take away the opportunity for reasoned reflection. [3 Wigmore, secs. 1747, 1749, 1750.] That is not the situation here, nor anything like it. Insured is *carrying on his business,* showing his medicines, in the course of which he is coughing and

hacking, and incidentally, as a matter of politeness, he explains the cause thereof by relating an occurrence that took place at the gate, and then goes out on the farm to see a prospective customer.

The other declarations to the Liggetts are made some hours afterward. He is not coughing then but is pale. He is sick at the stomach and is suffering with headache and backache but is not giving a spontaneous exclamation under the stress of his feelings. He is asking for a place to lie down, saying he thinks he will be better. What he there says about having swallowed a bug is not the spontaneous instinctive impulse born of his situation or condition and under the stress of which the control of his reflective faculties are in abeyance. Neither in the statements here made nor in those made to Mrs. Torbit is there such a continuous uninterrupted connection between the occurrence and the declarations as to constitute the two one transaction or to make the latter the spontaneous exclamations of the real cause free from the influence of the reflective faculties to reason over and narrate the happening of a past event. We think the declarations were not admissible as a part of the *res gestae,* and that this conclusion is supported by the following authorities. [Hopper v. Standard Life Ins. Co., 166 Mo. App. 209; Leahey v. Cass Ave. etc. Ry. Co., 97 Mo. 165; Ruschenberg v. Southern Electric Ry. so., 161 Mo. 70; Barker v. St. Louis etc. R. Co., 126 Mo. 143; State v. Hendricks, 172 Mo. 654, 672; Redman v. Metropolitan St. Ry., 185 Mo. 1; Dunlap v. Chicago etc. R. Co., 145 Mo. App. 215; Grant v. Kansas City Southern Ry. Co., 172 Mo. App. 334; Keefer v. Pacific Mut. Life Ins. Co., 201 Pa. 448; National Masonic Accident Ass'n. v. Shryock, 73 Fed. 774.]

The burden being on plaintiff to establish that insured's death was caused by bodily injury sustained by external violent and accidental means, and there being no evidence of such unless insured's declarations be admitted, and they not being admissible as a part of the *res gestae,* it follows that the case should be reversed. It is so ordered. The other judges concur.