FRANCES M. GOUCHER, RESPONDENT, v. WOODMEN ACCIDENT COMPANY OF LINCOLN, NEBRASKA, A CORPORATION, APPELLANT.—104 S. W. (2d) 289.

Kansas City Court of Appeals, April 5, 1937.

574

*Robison & Robison* for respondent.

*Culver, Phillip, Kaufmann & Smith* and *Sparks & Latham* for appellant.

SHAIN, P. J.—The plaintiff, the surviving widow of Robert L. Goucher, deceased, brings this action seeking to recover from defendant for the alleged accidental death of her said husband.

It is alleged that defendant issued to her deceased husband its policy and benefit certificate in consideration of premiums paid, and that plaintiff is the designated beneficiary.

The coverage clause in said policy involved herein is as follows:

"On account of injuries effected through Violent, External And Accidental Means, entirely independent of other causes, in case such injuries shall cause death within sixty days, or permanent and entire loss of sight of one or both eyes within sixty days, or shall immediately sever or within sixty days necessitate the amputation of one or both hands or one or both feet at or above the wrist or ankle, or cause total or partial disability, (provided that the Company shall not be liable for more than one indemnity specified for the same injury, nor for a greater sum in any case than the largest amount mentioned heretofore or hereafter), as follows:"

Plaintiff's petition alleges that the insured, while in due course of employment, slipped and fell and injured his spine, back and neck, spinal column and spinal cord, nerves and nervous system and within sixty days died from the injuries received in said accident.

The amount of coverage involved is $1000 and for this sum, together with attorney fees and penalty for vexatious delay, the plaintiff asks judgment.

By answer the defendant alleges itself to be a mutual Legal Reserve Company chartered and licensed in the State of Nebraska and licensed to transact insurance business in the State of Missouri as provided in Article 7 of Chapter 37 of Revised Statutes Missouri 1929, with all powers and privileges specified and granted therein.

The defendant answers the allegations of plaintiff's petition by general denial. No reply is shown by the record to have been filed.

Trial was before a jury and jury verdict rendered as follows:

"We, the jury, find the issues for the plaintiff and assess her damages at the sum of $1,000.00 and her damages for vexatious delay at the sum of $100.00 and the sum of $150.00 as and for attorneys' fees and the further sum of $27.50 as interest at the rate of six per cent per annum from November 27, 1935.

"G. E. Graham, Foreman."

Judgment was entered in accordance with the verdict and from the judgment defendant has duly appealed and we will continue to designate the parties as plaintiff and defendant to conform with situation in trial court.

There is no contention as to issuance of policy, payment of premiums and proof of loss.

The defendant makes five specific claims of error, which we briefly state as follows: Admission of evidence. Giving of instruction one on part of plaintiff. Failure to give peremptory instruction. Giving of instructions three and five on behalf of plaintiff submitting for penalty and attorney fees. Permitting of improper remarks by plaintiff's counsel.

These assignments will be more fully explained in the opinion.

### Opinion.

The error claimed in defendant's specification No. 1 presents a much discussed question, *res gestae*.

To a showing of the situation presented in the case at bar, we include herein the following proceedings bearing directly upon the question raised.

"Q. Now, Mr. Rhoads, did you notice Robert Goucher when he returned to the machine, after he had taken the load down to the John Porr farm? A. Yes.

"Q. Where were you, in reference to the machine, at that time? A. I was in my grain wagon at the machine.

"Q. Who was driving the truck that Mr. Goucher and Porr were in? A. Mr. Goucher.

"Q. Did he stop his truck there? A. He did.

"Q. Where did he stop it, in reference to where you were? A. To the side of my wagon, to the side of the machine.

"Q. Now, Mr. Rhoads, just tell the jury what you noticed about Mr. Goucher when he returned, if you noticed anything unusual in his actions and his condition when he got back. A. Well, I were in my wagon, scooping up the grain, and he backed into the side of my wagon to the machine, and when I noticed him he was by the truck, kind of holding to the truck.

"Q. Now, did you notice anything else unusual, whether he was pale, or not—whether or not he was pale? A. He was.

"Q. Now, from your observation of him when you saw him, what was your observation in regard to Mr. Goucher, whether he was in his usual and normal condition at that time or not? A. Well, I thought he was sick.

"Mr. Kaufmann: Wait just a moment—well, I will withdraw.

"The Court: Go ahead.

"Mr. Kaufmann: The answer was, 'I thought he was sick.' A. He just looked as if he was sick.

"Q. Now, just tell the Court just what evidence you noticed on which you predicate your thought that he was sick, what was he do-

ing, or what you noticed about him? A. Well, he was just kinda leaning against the truck, and very pale.

"Q. Well, now, did you have any conversation with him there at that time? A. I did.

"Q. Just tell the jury what you asked him and what he might have said in reply to it.

"MR. KAUFMANN: We object to that as hearsay.

"MR. ROBISON: Your Honor, we are ready to be heard on it, if you want to exclude the jury.

"MR. KAUFMANN: You are—certainly we want to exclude the jury. You are not going to try to say that that is part of the *res gestae?*

"MR. ROBISON: I certainly am, and I think I can show the Court I have got a right to show it, even if it was two hours after. Time is not the essence of the *res gestae.*

"MR. KAUFMANN: Well, we object—

"THE COURT: If you gentlemen want to be heard on it, I will excuse the jury.

"MR. KAUFMANN: Out of the hearing of the jury, in order that the Court may be fully informed concerning the subject-matter, the following questions were asked and the following proceeding took place.

"Q. (By Mr. Robison): Now, Mr. Rhoads, did you make a statement to Mr. Goucher at that time you saw him, that you have just testified about, in relation to his condition?

"MR. KAUFMANN: It is understood we are reserving our right to object to this as soon as we find out what it is about. A. When I seen the condition the man was in, I just asked him what was wrong with him.

"Q. (By Mr. Robison): What answer did he make to you? A. He said, I were in loading oats—

"THE COURT: A little louder. A. (Continuing): I went to throw in a scoop full of oats and my foot slipped and I wrenched my back.

"Q. And did he say anything as to the effects it had on him when his foot slipped? A. He said, 'It made me awfully sick.' "

It was shown in the examination that the grainery to where the grain was taken was approximately two and one-half miles.

On cross-examination, while the jury was out, the following is shown:

"Q. As I understand it, it is your opinion from your knowledge of the geographical location of these farms—knowing these farms as you do—and where they are located, and knowing the gates and all of that, it is your opinion it takes about forty or fifty minutes to go from the one farm where he got the oats, to where he unloaded them, is that right? A. How's that?

"Q. It takes about forty or fifty minutes to go from the machine to where they unloaded the grain? A. Yes, practically that.

"Q. In other words, to go down there and come back and unload the grain would take about two hours, is that correct? A. Well, I would imagine it would take forty or fifty minutes to make the trip each way, opening and shutting gates.

"Q. How long would it take to unload the grain? A. I imagine —I couldn't say, one man and a truck, a truck-load of oats.

"Q. Well, approximately how long—I am not trying to confine you to any specific minutes, but so we will have some idea in the record how long it would take? A. Well, approximately— probably as long as it would take to make the trip."

Following the above, inquiry was made by the court as follows:

"THE COURT: And you say at the time you asked him, he was standing—

"THE WITNESS: He had just got out of the truck.

"THE COURT: He had just got out of the truck?

"THE WITNESS: Yes, sir.

"THE COURT: In what position was he standing?

"THE WITNESS: Well, standing something like this.

"THE COURT: Leaning against the truck?

"THE WITNESS: Leaning against the truck, yes, sir.

"THE COURT: And you say his face—

"THE WITNESS: Was white.

"THE COURT: Was white.

"THE WITNESS: Yes, sir.

"THE COURT: He acted like he was in pain?

"THE WITNESS: Yes, sir.

"THE COURT: You then asked the question.

"THE WITNESS: Yes, sir.

"THE COURT: In response to your question he made the reply?

"THE WITNESS: Yes, sir.

"MR. ED. ROBISON: Did you notice anything there about his movements?

"THE WITNESS: He just kinda quivered.

"MR. ED. ROBISON: What about his ability to walk?

"THE WITNESS: Well, he was just poky when he walked.

"THE COURT: Well, I think it is admissible, gentlemen, I am going to admit it."

The Court after inquiry, in absence of the jury, overruled the defendant's objection to the said character of testimony, to which action of the court due objection was made and exception taken.

Thereafter, and in the presence of the jury, the following testimony was given:

"Q. Now, Mr. Rhoads, before I repeat the question which I asked

a minute ago, I will ask you one thing further: Did you notice anything about Mr. Goucher's walking, or movements or anything of that kind, when you saw him there? A. When?

"Q. When you saw him get out of the truck and just before you had a conversation with him that I asked you about a minute ago? A. The first I noticed of him, he was standing by the side of the truck.

"Q. But did you notice any movement of his body or anything? A. Just a kind of a quiver.

"Q. Did you notice anything about his walk as he went over to the truck? A. Yes, sir, after he started he just kinda drug his feet along.

"Q. I don't think I asked you then, did you notice anything about the color of his face? A. Yes, sir.

"Q. Tell the jury what you observed there, if anything? A. He was pale.

"Q. Now, Mr. Rhoads, did you make any inquiry or make any statement to Mr. Goucher when you saw him after he leaned against the truck? A. Yes, sir.

"Q. What did you say to him? A. I asked him what was the matter with him.

"Q. What did he state in reply? A. He said he was scooping oats, and when he was in there scooping, like this, his foot slipped and 'I wrenched my back.'

"Mr. SPARKS: I don't know whether all of the jury can hear that or not. I can't.

"THE COURT: State it over again. Tell it out loud enough so everybody can hear it.

"A. He said, 'I went to throw in a scoop of oats and my foot slipped and I wrenched my back.'

"Mr. KAUFMANN: Now, it is to that testimony that our objection all goes, and to the record heretofore made.

"THE COURT: Yes, the record is made on that.

"Q. (By Mr. Robison): Did he make any statement as to what happened after his foot slipped? A. He said, 'It made me awfully sick.'

"Mr. ROBISON: That is all.

"Mr. KAUFMANN: No questions.

"(Witness excused)."

In support of its contention, as to *res gestae* rule, defendant cites a long list of authority. However, as the Supreme Court of Missouri, in a recent opinion, Woods v. Southern Ry. Co., 73 S. W. (2d) 374, has reviewed the subject and definitely stated the rule, we quote the same and shall attempt to follow the same. The Court, in the opinion, l. c. 376, says as follows:

"It is argued that the trend of recent decisions is to extend the *res gestae* rule. However, an examination of the cases will disclose that the courts have not departed from the basic principle that, in order for a declaration to form a part of the *res gestae* it must be a spontaneous expression arising out of the main transaction and not a mere narration of a past event. As was said by the Court of Appeals of Kentucky in Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29, loc. cit. 32: 'The exclamation must be the act talking for itself, not the person talking about the act. It must be apparently spontaneous result of the occurrence operating upon the perceptive senses of the speaker (Illinois Cent. Ry. Co. v. Lowery, 184 Ala. 443 (63 So. 952), 49 L. R. A. (N. S.) 1149) rather than the result of reasoning from collateral facts.''

It will be noted that the question of time is not mentioned in the quotation above. Evidently its omission is accounted for by the fact that our courts hold that *time* is not a *necessary* ingredient of the rule. However, as time presents opportunity, a court of review cannot pass the element of time by without giving the same consideration. In the case of De Moss v. Evens & Howard Fire Brick Co., 57 S. W. (2d) 720, it is said:

"Furthermore, the witness had already stated that he did not recall the time in the morning when he had come from his own department into the carpenter shop, and had seen De Moss; and therefore in any event proof would have been lacking that any statement of De Moss was spontaneous, and made under the influence of the accident and within its immediate surroundings, so as to have brought it within the rule of *res gestae*. [Buttinger v. Ely & Walker Dry Goods Co. (Mo. App.), 42 S. W. (2d) 982.] It is to be borne in mind that this is not a case, as was Hill v. Edward F. Guth Co. (Mo. App.), 35 S. W. (2d) 924, where Moore had worked side by side with De Moss all morning long, in a position to hear all that was said, so that it might be inferred with propriety that any statement by De Moss regarding his injury was made immediately after the occurrence and while influenced by it.''

From our consideration of the authorities, we conclude that the question of time goes more to opportunity than it does to seconds, minutes and even, within reason, hours. The question involved is, *was the statement spontaneous,* and made under the *influence* of the accident and within the immediate surroundings and if so, the lapse of time between the occurrence and the statement does not of itself prevent same from being a part of the *res gestae*. [State v. Stallings, 64 S. W. (2d) 643; Scism v. Alexander, 93 S. W. (2d) 36.]

"Spontaneity seems to be a necessary element in order to make such a statement competent to be given in evidence.'' [Scully v. Rolwing, 88 S. W. (2d) 394.]

It has often been said by our textwriters and in judicial opinions that as to admissibility by reason of *res gestae,* that no hard and fast rule can be laid down. The question must always be determined upon the facts and circumstances presented in each case and the admission of such testimony is left largely to the discretion of the trial court.

The record in this case shows that the trial court acted with great deliberation and acted in consideration of all of the facts and circumstances presented.

The evidence discloses that the man had returned to the thrashing machine, had gotten out of the truck and was leaning against the truck. That he was white, acted like he was in pain and in a condition wherein he "quivered" and was "poky" when he walked.

With the above and with the evidence set forth above in mind, we conclude that there is such a showing of spontaneity and·such showing that the statement was made under the influence of the event that caused the condition shown, that the lapse of time shown will not justify us in convicting the trial judge of error in admitting the testimony complained of.

Defendant's specification two, as to plaintiff's instruction one, rests on conclusion as to specification one. The instruction submitted to the jury the issue of fact as to whether deceased accidentally lost his balance and slipped and wrenched his back while scooping oats. In accordance with our conclusion reached as to assignment one, there, is evidence that justifies the submission as made in instruction one, hence we conclude no error in giving same.

In passing upon defendant's third claim of error, refusal of demurrer, we must do so in light of our conclusions reached as to question of *res gestae* involved in assignment number one.

In accordance with our conclusion touching witness Rhoads' testimony, there is evidence that deceased in scooping oats his foot slipped and he wrenched his back.

If we give the plaintiff the benefit of the most favorable testimony, there is evidence from which an inference can be reasonably drawn that the injury caused the death. We, therefor, conclude that it was not error to refuse the demurrer.

It is but fair here to state that in reaching the conclusion above, we do so on the testimony of witness Rhoads and not in consideration of the contents of the proof of loss.

Defendant's claim of error in instruction three and five goes to the submission of the issue of penalty and attorney fees and not as to the mere wording of the instructions.

In other words, it is the submission of the issue that is challenged.

The statutes of Missouri, Section 5993, Revised Statutes Missouri 1929, specifically exempts fraternal beneficiary societies from allow-

ance of penalty and attorney fees by reason of vexatious delay. However, in determining the question of fraternal beneficiary, we must look to the contract rather than to the name by which chartered to do business.

It is shown that the defendant company was chartered and licensed to do business in Missouri on an assessment plan. Stated by defendant, "as a mutual company."

From an examination of the insurance contract in evidence, it is shown to be issued on a straight quarterly stipulated premium. It is not shown or indicated in the contract that the payment of the premiums is in any way dependent upon collection of assessments upon persons holding similar contracts. The claimed mutuality rests in the appellation alone and not upon any provision of mutuality characterising fraternal benefit associations.

From an examination of the contract, we conclude that defendant is not exempt from penalty for vexatious delay. [Williams v. Mutual Benefit Health & Accident Ass'n, 46 S. W. (2d) 264.]

The defendant contends that there is no evidence upon which to base a finding by reason of vexatious delay.

It is the law of this State, State ex rel. Continental Life Ins. Co. v. Allen, 303 Mo. 608, that an insurance company cannot be penalized for vexatious delay if it has a meritorious defense. However, where there is any evidence in support the question becomes one for the jury.

In the case at bar it is shown that proofs of loss were duly made. Thereafter additional proof was required and plaintiff, at the request of defendant, executed an authorization for the additional proof. It is further shown that forty-seven days elapsed after proof was in before suit was brought.

In the face of the fact that it has been held, that declining to compensate for loss without litigation raises an issue of fact as to vexatious delay, we conclude that there was sufficient evidence in this case to justify the submission of the question.

As to defendant's point five, we set forth in full the remarks made by plaintiff's attorney together with the objections and rulings by the court.

"What do you pay your insurance for, year after year? Because you believe if your death occurs that company will pay to your wife or your beneficiary the amount of that policy after you are dead and gone and you are not here to help—but the beneficiary, the widow, and that boy, they are in this courtroom as against that monstrous company; why Kaufmann said years ago they used to try to get a —I will say to you today they have taken the money of this policyholder here for four or five years in this case, they are not working for nothing—here they have four lawyers in this case; they are not

working for nothing. Here they have five doctors in this case. They are not working for nothing. They have money to defend against this poor woman, but they have nothing to pay on the policy.

"MR. KAUFMANN: I object to that character of argument as being wholly improper, prejudicial, and an effort to influence and prejudice the jury against the defendant, and we ask the court to reprimand counsel and instruct the jury to disregard such argument.

"THE COURT: Overruled.

"To which action, order and ruling of the court, the defendant then and there at the time duly excepted, and still excepts.

"MR. KAUFMANN: We now ask, in view of the ruling of the court, in overruling the objection, that the jury be discharged.

"THE COURT: Overruled.

"To which action, order and ruling of the court, the defendant then and there at the time duly excepted, and still. excepts."

Having been indulged, in former years, in the practice of the law, we are not unmindful of the prerogatives of that noble calling. A law suit has been likened into a battle royal, wherein opposing counsel has, as is said in Evans v. Trenton, 112 Mo. l. c. 39, the right to: "In his address to the jury it is his privilege to discent upon the facts proved or admitted in the pleadings; to arraign the conduct of the parties; to impugn, excuse, justify or condemn motives, so far as they are developed in evidence. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as the learning can make it; he may, if he will give play to his wit,- or wings to his imagination."

We further recognize that the matters involved in arguments before juries rests in the sound discretion of the trial court. However, as was said in Norris v. Railroad, 239 Mo. l. c. 721, and quoted- with approval in State v. Shain, 101 S. W. (2d) l. c. 19: "The trial court should not permit argument which amounts to an appeal to the jury to give judgment for one party on account of his poverty or the wealth of the opposite party; and trial courts should promptly rebuke counsel who indulge in such arguments. The most effective way of shutting out improper argument is for the trial court to inform the attorney that a verdict obtained by improper remarks will promptly be set aside by the trial court."

The plaintiff herein makes claim that the remarks objected to were retaliatory. Retaliatory of what is not shown and there is not enough shown in the argument as it appears in the record to justify us in concluding same was retaliatory to any objectionable matter disclosed by the record.

To the highly objectional matter shown in the argument, the defendant objected and asked the court to reprimand counsel. This

the court refused to do. Defendant then asked for discharge of the jury, which in turn was refused.

Under such a situation the jury would be justified in concluding that the trial court acquiesced in the sentiment that the defendant company was a monstrous company with money that was pitted against not only the widow, but her child and dependent as well.

Such remarks should not go unchallenged and unrebuked in a court of justice. It was prejudicial error to permit same without some word of disapproval from the trial court.

Based alone on defendant's assignment of error number five, the judgment herein is reversed and cause remanded. *Reynolds, J.,* concurs; *Bland, J.,* dissents in separate opinion.

## DISSENTING OPINION.

BLAND, J.—I am of the opinion that the judgment should be reversed. It is apparent that there is no possibility of a recovery in this case without the testimony of Mr. Rhoads concerning what insured said to him about the receipt of the latter's injury. These statements of the insured, in my opinion, cannot be considered a part of the *res gestae*. They do not meet with the conditions necessary to come within that exception to the hearsay rule. What is necessary in order to make a declaration a part of the *res gestae* is well stated by Judge TRIMBLE in the case of Freeman v. Loyal Protective Insurance Company, 196 Mo. App. 383, 391, as follows:

"Now it is well settled that declarations need not be contemporaneous with the exciting cause, nor can there be any general rule fixing a definite length of time as determinative of their admissibility. But where there is a lapse of time between the occurrence and the declarations, the latter must be made under circumstances which show that they are the spontaneous, unreflecting, instinctive impulse generated by some physical shock, stress of nervous excitement, or excited feeling which extends continuously and without abatement or dissipation from the moment of the occurrence to the time of the declaration in such full sway as to dominate the reflective faculties and take away the opportunity for reasoned reflection."

What was said in that case, l. c. 392, described a situation very similar to the one in the case at bar.

"What he there says about having swallowed a bug is not the spontaneous instinctive impulse born of his situation or condition and under the stress of which the control of his reflective faculties are in abeyance. Neither in the statements here made nor in those made to Mrs. Torbit is there such a continuous uninterrupted connection between the occurrence and the declarations as to constitute the two one transaction or to make the latter the spontaneous exclamations of the real cause free from the influence of the reflective

faculties to reason over and narrate the happening of the past event."

The circumstances surrounding the purported declarations in the case at bar are not sufficiently developed to bring the insured within the conditions laid down in the Freeman case. The time elapsing between the alleged accident and the declarations, the lack of a showing of "a continuous uninterrupted connection between the occurrence and the declarations," the fact the declarations were made far from the scene of the accident and that insured was able to drive a truck so great a distance after the alleged accident and the fact that he made no voluntary exclamation but merely answered questions propounded to him, all disclose a lack of sufficient evidence to show spontaneity in his declarations.