Edgar W. GREEN, Respondent,

v.

RALSTON PURINA COMPANY,
a Corporation, Appellant.

No. 49693.

Supreme Court of Missouri,

Division No. 1.

March 9, 1964.

Samuel Richeson, Dearing, Richeson & Weier, Hillsboro, Dorman L. Steelman, Salem, J. A. Fraser, St. Louis, for defendant-appellant.

Geo. F. Addison, L. Clark McNeill, Salem, for respondent.

HOUSER, Commissioner.

Edgar W. Green, a dealer in feeds and raiser of broilers on a commercial scale, sued Ralston Purina Company for $22,239.88 loss of broilers and $100,000 loss of future earnings, investment and good will, a total of $122,239.88, based upon breach of warranty that chicken feed defendant sold plaintiff was a wholesome and fit "complete" broiler food. Ralston Purina filed a general denial; an affirmative plea that any loss or damage suffered by plaintiff was the direct result of his own conduct, and a counterclaim for $22,767.59 plus interest, claimed due Ralston Purina on several negotiable instruments in the form of 75-day trade acceptances, executed by plaintiff (Count I); $3,680.85, plus interest, on certain 120-day trade acceptances (Count II); and $3,475.42, plus interest, on an itemized account for goods sold by defendant to plaintiff (Count III). Count III was dismissed by defendant during the trial. A trial jury returned a verdict finding the issues for plaintiff and against defendant "on the plaintiff's petition and on defendant's counterclaim," and assessing plaintiff's damages at $57,166.66.

The petition alleged that defendant manufactured and sold its prepared broiler raiser feed as a "complete" broiler food, in accordance with an established trade custom and under a warranty that it was a complete and whole feed for this purpose, and that plaintiff bought and fed this feed to his broilers, and sold it to his customers, relying upon the warranty; that in violation of the custom and in breach of an express and an implied warranty the feed was not wholesome and fit for the purposes warranted, and was not a complete broiler feed, adequate without supplementation, to sustain and promote normal health and growth of broilers. Plaintiff also charged defendant with negligence in failing to mark on the label that the feed was not a complete food but was merely a supplement and that other supplemental food was required; failing to warn that it was merely an experimental formula and that no adequate research had been conducted to determine the safety, efficacy, efficiency or completeness of the feed, and in failing to include and provide sufficient nutriment for the healthy growth and development of broilers. Plaintiff alleged that beginning in October, 1957 and continuing for a period of approximately two years plaintiff fed this feed to his broilers and sold it to his customers, as a result of which his broilers became sickly, afflicted and died and others failed to develop and become marketable; and that he lost customers.

Abandoning the charges of negligence plaintiff went to the jury on breach of implied warranty.

Defendant's points IV and IX raise the question whether plaintiff introduced sufficient evidence either to make a submissible

case or to support the giving of main verdict-directing Instruction No. 1. Defendant claims there was no evidence to warrant the submission that the food was not a complete food, or a wholesome food, or that it caused the broilers to 'sicken and die and others to stunt and fail to develop.

Plaintiff's evidence showed that in the fall of 1957 defendant came out with a new high fat broiler feed called "Top Banana," from which defendant's representatives said the growers could· expect to produce a pound of broiler on two pounds or less of feed; that they had finally "broken the 2-pound barrier" ; that it would be "better than anything [the growers] had ever had"; that they had overcome the problem of putting animal fat in greater amounts in feed and had developed pellets firm enough to stand up and not crumble. About October 1, 1957 plaintiff began feeding Top Banana to his various flocks in his own houses and in the houses of several contract growers. Before that date on the feed previously used he had experienced a normal 5% mortality rate and a normal feed conversion in the production of broilers. After that date, with no change in his methods of operation or management except a change to Top Banana feed, he testified that he suffered an average mortality rate of 29% and feed conversion rates varying in different flocks· from 2.19 to 3.73, whereas a mortality rate of 5%· and a feed conversion rate of 2.30 was to be expected. His evidence indicated that as these flocks reached the age · of from three to seven weeks the chickens would develop an uneven,· "staggery," wobbly gait and wobbly legs; get down on their legs, squat and be unable to walk, "holler" and make peculiar noises. "You could tell it hurt them to move." They were restless, wilder than normal and would shake, tremble and quiver. They developed into irregular sizes, showed a lack of uniformity, and had to be culled at marketing time. The mortality rate would increase rapidly and they would die in large numbers. Post-mortem examinations disclosed red splotches on the birds; a hemorrhagic condition of the skin; a strawberry-colored, bloodshot condition of the intestines and body cavity; thin and watery blood; yellow or straw-colored liquid in the heart sac, and the heart would seem to be excessively fat. Some of the conditions were commonly known and some had never been encountered prior to the use of Top Banana.

Plaintiff's evidence showed that Top Banana was much darker than other feed, looked like bran or chops mixed together, was greasy and looked like it had cylinder oil poured over it; it had a strong rancid odor. Plaintiff did not feed Top Banana exclusively. Twelve or fifteen of the 28 flocks grown by plaintiff during the period involved were fed a mixture compounded by plaintiff's employees in plaintiff's mixer, consisting of defendant's Chowder Mix, a broiler concentrate feed, to which plaintiff added his own ground corn which plaintiff purchased from various truckers. Plaintiff's employees found and sifted from the Chowder Mix "fat balls," dark, black, greasy balls ranging in size from that of a match head to a half inch in diameter. Plaintiff sent some of these to defendant's laboratory for analysis, but received no report on their contents. Defendant's witnesses testified they were formed by fish solubles and that their ingredients were corn, milo, oats, dehydrated alfalfa, corn gluten feed, cottonseed meal, soybean meal, fish meal, fish solubles and meat scraps.

Plaintiff's manager testified that Dr. McCune of Missouri University made an investigation and reported that he did not know and could not tell whether it was a feed problem or a chicken problem. He said it *could be* a combination of both; that it *might be* that the chickens were not strong enough to stand the feed or that the feed was not strong enough for the chickens; that it *might* have too much fat. In many tests made nothing was found wrong. Orville Black, contract grower, testified he did not know whether the feed "killed the chickens or not, but they died."

Statistics compiled by plaintiff from original records of all flocks and all feeds used after October 1, 1957 showed the number of deaths above normal mortality, but these statistics did not differentiate between deaths caused by feed problems and deaths caused by the ordinary diseases which plaintiff admitted all flocks have from time to time, such as chronic respiratory disease, salmonella, synovitis, etc., and did not take into account deaths from crippling, injuries in moving, bad weather, and other accidental mortality. Plaintiff admitted 1232 deaths in one brood on the first four days resulting from a severe cold wave, and that deaths in the first week are not usually caused by any feed difficulty, but nevertheless in making his claim for excess mortality over normal mortality "caused by bad feed" plaintiff sought compensation for all chickens that died over normal mortality, regardless of cause of death.

The defense was that the trouble was due to disease, poor management practices, such as failing to change the litter between flocks, and not to the feed. A veterinarian, manager of defendant's animal pathology division, found numerous diseases in chickens of plaintiff on which he conducted post-mortems: infectious synovitis, chronic respiratory disease, salmonella, naval infection, epidemic tremor and hemorrhagic syndrome, none of which is caused by feed. Three out of 21 chickens examined had hydropericardium. There are five or six causes of this disease, one of which is the toxic fat factor. Toxic fat is an animal feeding grade fat which when fed to chickens may be toxic to them. Introduced into feed it has a very high potency. One of defendant's other dealers had a problem which was identified in December, 1957 as due to toxic fat. Some toxic fat did go into defendant's feed, some of which was called Top Banana. Every effort was made to identify the source of the toxic fat. Defendant worked with Merck Company on the problem. Kentucky Chemical Company was found to be the source of the fat. The most common denominator found which would "tie down to the involved flocks" was this one source of fat. That source was discontinued; the fat impounded; not further used, destroyed and removed from the premises as soon as possible. After December, 1957 but at a time not specified, two other sources of toxic fat developed. There was no proof, however, that there was toxic fat in any of the feed shipped to plaintiff, or that any of the feed sold to plaintiff by defendant and fed to his flocks contained toxic fat.

To recover for breach of implied warranty of wholesomeness plaintiff not only had the burden of proving facts from which such a warranty would arise, but also that defendant's product was actually harmful or deleterious in some way, Dougherty v. Lee, 74 Cal.App.2d 132, 168 P.2d 54, 55; Anno.: Animal and Farm Supplies —Liability, 81 A.L.R.2d 138, § 17, p. 162; and that there was a causal relationship between the unwholesome product and the loss sustained; Quaker Oats Co. v. Davis, 33 Tenn.App. 373, 232 S.W.2d 282, 289; American Cyanamid Co. v. Fields, 4 Cir., 204 F.2d 151, 153; Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N.W. 40; Anno., 81 A.L.R.2d 138, § 21, p. 165; in this case, that unwholesome feed supplied by defendant "was the efficient cause of the production difficulties experienced" with plaintiff's flocks. Ralston Purina Co. v. Edmunds, 4 Cir., 241 F.2d 164, 167. Plaintiff was not bound to exclude every other possible cause, Monahan v. Economy Grocery Stores, 282 Mass. 548, 185 N.E. 34; Peckham v. Eastern States Farmers' Exchange, 1 Cir., 134 F.Supp. 950, aff. Eastern States Farmers' Exchange v. Peckham, 1 Cir., 234 F.2d 488, or to prove an "absolutely positive causal connection." Bradford v. Moore Bros. Feed & Grocery, 268 Ala. 217, 105 So.2d 825. After showing the unwholesomeness of the product a prima facie case would be made where the evidence was susceptible to a *reasonable inference* that the death

or illness resulted from the eating of the unwholesome feed. Dougherty v. Lee, supra, 168 P.2d, l. c. 56. The finding, however, must be based upon probative facts, and a verdict founded on speculation and conjecture cannot stand. American Cyanamid Co. v. Fields, supra. Probative facts may be established by circumstantial evidence, and while circumstantial evidence need not have the quality of absolute certainty, Ferrell v. Sikeston Coca-Cola Bottling Co., Mo.App., 320 S.W.2d 292, the circumstances must point to the desired conclusion with such a degree of certainty as to make that conclusion reasonable and probable and must rise above the stature of guesswork, speculation or surmise. Gray v. Williams, Mo.App., 289 S.W.2d 463. Plaintiff's evidence must be viewed in the light most favorable to him, and he is entitled to the benefit of all inferences reasonably arising from the evidence. American Cyanamid Co. v. Fields, supra.

■ Under these rules the evidence is not sufficient to form a substantial basis for the jury verdict for plaintiff. There was sufficient evidence to find that there was an implied warranty that the feed was wholesome and fit for use as a chicken feed, at least as to that portion supplied in sealed bags, Albers Milling Co. v. Carney, Mo. Sup., 341 S.W.2d 117 [1], but plaintiff failed to prove an implied warranty that Top Banana was a complete feed not requiring supplementation, and failed to prove that the feed was unwholesome, and that unwholesome feed caused the production difficulties.

■ The solution of the question whether Top Banana and Chowder Mix would cause chickens to sicken, stunt and die, and to manifest the abnormalities found on postmortems, is essentially a matter of expert opinion; questions of medical science which a court or jury could not answer without the aid of expert opinion, Dunn v. Ralston Purina Co., 38 Tenn.App. 229, 272 S.W.2d 479, 482; Tracy v. Liberty Oil Co., 208 Iowa 882, 226 N.W. 178, but plaintiff pro-

duced no expert witnesses to establish that the feed was unwholesome or harmful or that it caused the production difficulties encountered. Plaintiff did not show either by expert or lay opinion that the Top Banana or Chowder Mix supplied plaintiff was unwholesome, harmful, contaminated, adulterated, or that it contained any deleterious substances, unless this may be found in the evidence that "a few" moldy lumps or "fat balls" were found in some of the feed. That evidence would be insufficient, however, as a basis for the verdict because plaintiff did not show that these fat balls were moldy when the feed was received by plaintiff from defendant, or that any moldy feed was actually fed to his chickens, or that feed with moldy fat balls in it will kill or injure chickens, see Burns v. Ralston Purina Co., 210 Ga. 82, 77 S.E.2d 739, or that such a consequence occurred in this case. Plaintiff failed to prove the content, composition and ingredients of Top Banana, other than that it was a high fat content broiler feed; and failed to show that the feed was deficient in any respect from a nutritional standpoint. While there was evidence that defendant had toxic fat troubles there was no evidence, direct or circumstantial, that toxic fat was contained in the feed shipped by defendant to plaintiff or fed to plaintiff's flocks during the period.

■ Plaintiff relies upon the *post hoc ergo propter hoc* method of proof. The plaintiff's theory is that before using the feed the flocks sustained only a normal 5% average mortality, but after using the feed they sustained an abnormal 29% average mortality, therefore the feed was unwholesome and harmful and the cause of the excess mortality. We note that the average mortality was not 29% as plaintiff testified orally but was 12.2%, if we correctly compute the figure from plaintiff's Exhibit A, which lists the mortality rate of each of the 75 flocks raised by plaintiff and all his contract growers during the period in question. But whether it was 29% or 12.2%, there was no substantial evidence of causation. The only approach to proof of causa-

tion was the testimony that defendant's salesman Hilgedick stated that plaintiff's problem "evidently was a feed problem" (too indefinite to amount to substantial evidence of causation), and the following: While testifying on damages plaintiff referred to his claim against defendant for damages "from this bad feed," and when questioned as to when he made up his mind he was having trouble with his chickens "from Top Banana feed," he answered "I would say in the month of January, * * * of '58." These two oblique references are not definite enough or sufficient to constitute a lay opinion that the feed was the proximate cause of the excessive mortality and other bad results experienced. From the statistics compiled in Exhibit A no general recognizable pattern emerges as the basis for an inference of reasonable probability of causation. Plaintiff did not have trouble with every flock fed Top Banana. There was wide fluctuation in the mortality rate as between the several flocks, ranging from 2% to 42% mortality. Some of these wide variations between two flocks raised by the same grower on the same feed under the same conditions occurred quite near in point of time. The average mortality rate of the 28 flocks fed exclusively on defendant's products was 14.1%. Of the 28 flocks of which complaint is made four flocks experienced 6% mortality or less. Fourteen had 12% or less. Only six flocks had mortality rates in excess of 14%. In the 24 flocks fed on feed purchased from a competitor, Stamper, (flocks grown by the same growers in the same houses during the same period) quite similar wide variations and results were experienced. Mortality on Stamper feed varied from 1% to 47%. Nine flocks on Stamper showed a mortality rate of 6% or less; fifteen showed 12% or less. Eight were above 14%. There was no evidence of the experience of other broiler raisers using defendant's products. (There was evidence that another dealer "had a problem" due to toxic fat, but this was not developed, and is too indefinite and uncertain to have any significance or weight.) There was no evidence that the symptoms found when plaintiff's chickens were "posted" (given post-mortem examinations) were typical symptoms to be expected if they died as a result of eating unwholesome food. The only evidence on this question supported the contrary inference, that they died of various poultry diseases. Plaintiff's case of breach of implied warranty is essentially based upon the circumstantial evidence that the chickens sickened, stunted and died after eating this feed. This is not enough to raise a reasonable inference that unwholesome feed was the proximate cause of the production difficulties, with that degree of certainty or probability required. Thus in Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N.W. 40, l. c. 41, the Iowa Supreme Court said that in a case of this kind, where there was no expert testimony on causation, no post-mortem evidence favorable to plaintiff and no evidence that the injury to the herd of hogs was the result of feeding to them the preparation manufactured by defendant, " * * * proof that the animal died or was permanently injured does not alone establish a case for the plaintiff. * * * The evidence is wholly wanting to connect the death of these hogs with the feeding of this preparation, and equally so as to their stunted growth. * * * The record is wholly wanting in evidence showing that the death and the injury to these hogs were not the result of disease or other natural causes not chargeable to the use of this preparation. With this state of the record the court should not have allowed this case to go to the jury." And in Tracy v. Liberty Oil Co., 208 Iowa 882, 226 N.W. 178, 182, the same court said: "There was no evidence that any of the ingredients of the mineral were per se dangerous or deleterious, or that its administration was the proximate cause of the death of the hogs. The veterinarians spoke of gastritis, enteritis, hemorrhagic septicaemia, as a probable cause of the death of the hogs in question. * * * If it may be concluded, from the circumstances surrounding the case, that [the facts] indicate simply a possibility that the theory of plaintiff is

true, then plaintiff has not made out his case." In Poovey v. International Sugar Feed No. 2 Co., 191 N.C. 722, 133 S.E. 12, a suit for breach of implied warranty of fitness, where defendant sold plaintiff feed for his cattle, and they died after eating it along with some wheat straw and "other roughness," and there was no evidence that there was any poisonous or deleterious matter in the defendant's product, the court said: "The conclusion from the testimony is irresistible that the only evidence of a breach of warranty was the fact that after feeding the product for ten days or more two of plaintiff's cows died from what was diagnosed as ptomaine poisoning. No analyses of the stomach of the dead cows was made, and it appears from the record that the particular cows that died were also fed with 'wheat straw and roughness.' The mere sickness and death of the cows is not sufficient evidence in itself to establish a prima facie case of breach of warranty. The doctrine of 'res ipsa loquitur' does not apply to a breach of warranty [citing authority]. There is no more reason to conclude that the cows died from this particular feed than that there was some deleterious or injurious substance in the 'wheat straw or roughness' that was fed to them at the same time. * * * [T]he evidence of the breach of warranty was not sufficient to be submitted to the jury, * * *." And in Murphy v. Sioux Falls Serum Co., 47 S.D. 44, 195 N.W. 835, in a negligence case, where there was no evidence of defendant's negligence "other than the death of the hogs" it was held that a verdict could not stand, because it rested only upon conjecture and speculation.

The evidence makes it clear that causes for which the defendant is not liable were at least equally probable, if not more probable, causes of the production difficulties as the defendant's feed. We refer to the different poultry diseases in evidence, the symptoms of which were revealed by numerous post-mortems conducted on chickens fed with Top Banana; poor growing methods admitted by plaintiff and his contract growers, such as failing to clean the houses and replace the litter after each flock was sold; not using chemically treated footpads to prevent spread of infectious disease from house to house; casualties from weather, crippling, etc. Plaintiff made no effort to show that his chickens did not sicken, stunt or die from disease or casualty, but admitted some died from casualty and testified that all flocks have some disease from time to time. The testimony of plaintiff's general manager, that Dr. McCune, the expert whose advice he sought, could not tell whether there was a feed problem or a chicken problem and that it *might be* that the chickens were not strong enough to stand the feed or *might be* that the feed had too much fat, shows the alternative possibilities, and that plaintiff's case was based upon speculation and guesswork, and points up the fact that no issue for the jury was raised. Ralston Purina Co. v. Edmunds, supra. The most that can be said of plaintiff's evidence is that it established the *possibility* that his production difficulties resulted from the use of Top Banana and Chowder Mix, but the possibility of fault and causation is not sufficient to attach liability, where there are alternative possibilities under one of which defendant is liable and under the other of which there is no liability. Ralston Purina Co. v. Edmunds, supra.

Point II assigns prejudicial error in overruling defendant's objection to argument of plaintiff's counsel to the jury, in failing to reprimand plaintiff's counsel, and in overruling defendant's motion for a mistrial, based on plaintiff's argument as to the size and wealth of defendant and its ability to buy witnesses, and that the court magnified the error by stating that plaintiff's counsel was within his rights.

The following occurred during the opening argument in behalf of plaintiff:

"MR. McNEILL: * * * This is a place where men and corporations must have their arguments decided.

"MR. RICHESON: I want to object to that type of argument, it is prejudicial.

"THE COURT: Continue, Mr. McNeill.

\* \* \* \* \* \*

"MR. McNEILL: This represents a struggle of a little man against one of the biggest corporations in the business.

"MR. RICHESON: I object to the argument of poor man and little man. It has been condemned many times by the Court. May I ask the Court to reprimand counsel for making that argument?

"THE COURT: I assume it was not made in bad faith and that it will not continue.

"MR. RICHESON: I move the Court to discharge the jury and declare a mistrial.

"THE COURT: The motion will be denied. Continue, Mr. McNeill.

\* \* \* \* \* \*

"MR. McNEILL: Any corporation that can reach out and bring witnesses from Germany, Jefferson City or anywhere else can by their soul.—

"MR. RICHESON: I want to object to the prejudicial argument.

"THE COURT: I think he is within his rights, Mr. Richeson. Go ahead."

 An individual and a corporation come before a court as equals in the eyes of the law. A comparison between the size, power or wealth of the litigants is wholly extraneous and should not be made by counsel. A reference to the financial ability of a corporate defendant to "buy the soul" of witnesses appearing in its behalf is patently improper. It carries the implication if not an indirect charge of subornation of perjury. This has no place in a trial in a court of justice, in the absence of supporting evidence. The rich-man-poor-man argument, in which counsel consciously and deliberately array the size, wealth or power of a corporation on the one hand against the position of an individual on the other, and an argument that the corporation has the resources to buy the soul of the witnesses appearing in its behalf, could have no other effect than to prejudice the corporation in the eyes of the jury and deprive it of its right to a fair and impartial trial. See Beck v. Quincy, O. & K. C. R. Co., 129 Mo.App. 7, 108 S.W. 132. Such statements are "dangerous and harmful indulgences, potent in exciting sympathy or prejudice, and should be discouraged, especially when apparently used for that purpose \* \* \*." Hendrick v. Kauffman, Mo.App., 66 S.W.2d 985, 988. This type of jury appeal is not permitted. It is the duty of the trial judge to stop such an argument at its inception; to instruct the jury to disregard it, and to reprimand counsel. A mistrial should be declared where it appears impossible for the jury to deliberate dispassionately on the merits of a cause or defense as a result of the action of counsel in charging the atmosphere of the trial with prejudice. Instead of nipping it in the bud the court in this situation encouraged counsel to go to full bloom in making a prejudicial argument by directing counsel to continue, and by assuming that the argument was not made in bad faith. The court then condoned and stamped its approval on the argument by the erroneous comment that counsel was within his rights. This constituted error, Goucher v. Woodmen Accident Co., 231 Mo.App. 573, 104 S.W.2d 289, 295; Beer v. Martel, 332 Mo. 53, 55 S.W.2d 482, sufficient alone and of itself to effect a reversal of the judgment.

Although the points considered are dispositive of this appeal, other points deserve brief mention.

██ ██ Point I involves the action of the court in orally instructing the jury. After deliberating 45 minutes to an hour the jury, brought back into the courtroom, asked the court "whether if they found for plaintiff, plaintiff would still have to pay the counterclaim." The court orally stated

that "There are in effect two lawsuits. If you find for the plaintiff and also for the defendant on the counterclaim in any amount, the difference between the two would be the final amount of your verdict." This was error because instructions should be in writing, and because the instruction given was not complete and did not cover all of the possibilities. Where there are issues to be resolved both on petition and counterclaim verdict forms covering all possibilities should be given. Reference is made to Disbrow v. People's Ice, Storage & Fuel Co., 170 Mo.App. 585, 157 S.W. 116 [2] for a helpful discussion of the proper way in which to instruct in such a case.

Point III relates to the action of the court in failing to take corrective action when, according to defendant's counsel, plaintiff's wife audibly said "You lied like a dog" to one of defendant's witnesses as he was leaving the witness stand. The record supports the conclusion that the jury did not hear the remark, and we are not prepared to say that the court abused its discretion in not taking corrective action on this ground.

Point V raises the question of the propriety of the language of Instruction No. 8A, directing the jury to find against the defendant on its counterclaim for the purchase price for any part of the feed found to be unfit for feed for growing broilers "for any of the reasons shown in the evidence." On a new trial such a roving commission should not be employed, but the jury should be guided and directed by reference to the specific reasons in evidence.

We find no error in the admission of the evidence of defendant's employee, Hilgedick, as suggested in Point VII. On the admissibility of opinion evidence of lay witnesses as to diseases and physical condition of animals and fowls see Albers Milling Co. v. Carney, Mo.Sup., 341 S.W.2d 117, 122; Anno.: Opinion Evidence—Animal—Condition, 49 A.L.R.2d 932.

It is not necessary to explore the point relating to the alleged excessiveness of the verdict. For whatever assistance it may be worth, we refer to Anderson v. Abernathy, Mo.Sup., 339 S.W.2d 817 and Fuchs v. Curran Carbonizing and Engineering Co., Mo. App., 279 S.W.2d 211, on the requirements in proving loss of profits in the case of an established business.

The judgment is reversed for failure of proof. The record does not indicate that all available essential evidence has been fully presented and that no recovery can be had in any event. It appearing that on a new trial plaintiff may be able to make a submissible case, Prince v. Bennett, Mo. Sup., 322 S.W.2d 886 [3]; Mo.Dig. Appeal & Error, [7], the cause is remanded for a new trial on all issues.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.