Russell M. PECKHAM and Harold C. Murphy d/b/a Orchard Hill Farm, Plaintiffs,

v.

EASTERN STATES FARMERS' EXCHANGE, Incorporated, Defendant.

Civ. A. No. 1380.

United States District Court D. Rhode Island.

Aug. 18, 1955.

which they had purchased from the defendant's representative a few days earlier. This grain was shipped directly from the defendant's plant at Buffalo, New York, with other grains, seeds and other products destined for delivery to other farmers living in the same general locality as the plaintiffs.

The plaintiff, Russell M. Peckham, testified that some of the bags containing the grain bore dark, dry spots when they were delivered to him. Grain from a bag which bore such stains at the bottom thereof was first fed to the plaintiffs' cows on June 16, 1950. The evidence established that the feeding practice then employed by the plaintiffs was to open one of the bags, each of which contained approximately two bushels, and remove a bushel of its contents at a time. According to Mr. Peckham, the first bushel so removed was fed to the two rows of nine cows and the remaining bushel was then fed to the fourteen who were in the third row. In this respect he was corroborated by his hired man. Mr. Peckham also testified that the quantity given to each cow depended upon its milk production, the larger quantities being given to the cows producing the more milk. These cows, he said, were all in the row of fourteen. In this connection, it may be noted that this version of the feeding practice is the one which he gave to Dr. Freitas on June 17th, the day when he was first called to the plaintiffs' farm to examine one of their cows that was on the ground in the pasture and obviously ill. The contents of a second bag of the defendant's grain was fed in similar fashion on Saturday, June 17th, but no further feedings were made therefrom, two of the cows dying on that day. Four additional cows died during Sunday night and the remaining eight of the fourteen stalled in the row of fourteen died within the next five days. All of the cows which died displayed the same symptoms of illness prior to their deaths.

The evidence established beyond question that all of these cows were healthy animals prior to June 16th.

Aram A. Arabian, Providence, R. I., Maurice L. Dannin, Newport, R. I., for plaintiffs.

Matthew W. Goring, Stephen B. Ives, Jr., Providence, R. I., for defendant.

DAY, District Judge.

The plaintiffs in this action are dairy farmers who in June 1950 purchased forty bags of Sweepstakes grain, so-called, from the defendant to be fed to their cows. They allege that fourteen of said cows, as a result of eating said grain, became ill and died. They seek to recover the value of said cows and the amount of certain incidental losses claimed to have been sustained by them as a result of their deaths.

Although the trial was somewhat protracted, there being many witnesses, there was no dispute as to many material facts. Prior to June 17, 1950, the plaintiffs owned thirty-two Guernsey cows and two bulls. The cows were fed in the plaintiffs' barn in three rows; i. e., in two rows of nine each, and in a third row of fourteen. The bulls were kept in stalls at the end of the row of fourteen cows. On June 15, 1950, the plaintiffs accepted delivery from the defendant of forty bags of its Sweepstakes grain

When the plaintiff Peckham discovered the first sick cow he called one Dr. Cyril J. Allen, a veterinarian licensed to practice in Massachusetts. He administered treatment which proved ineffective. Later in the day, Dr. Allen made a search of the farm premises to determine if there were any vegetation of any kind which might have caused this cow's illness. When he found other cows lying in the pasture displaying similar symptoms he suggested that a veterinarian licensed to practice in Rhode Island should be called for a consultation. It was later that day that Dr. Freitas appeared.

The evidence further establishes that on June 21st the plaintiff Peckham called Robert E. Steere, the field manager of the defendant, and advised him of the situation with respect to his cows. Mr. Steere went to plaintiffs' farm on that date and was told by the plaintiff Peckham of what had happened to his herd. It is clear that he called the office of the defendant on this occasion and reported the situation at the plaintiffs' farm. There is a substantial dispute as to what he reported. Plaintiff Peckham said he told his office "things look black"; Mr. Steere, on the other hand, contends he merely said that a serious complaint had been made to him about the grain. In any event, it is clear that at this time defendant had notice that plaintiffs were contending that the grain had caused the sickness and death of their cows. Mr. Steere returned to the plaintiffs' farm on the next day and obtained samples of the remaining contents of each of the bags used by the plaintiffs. These samples and two samples from unopened bags were sent by him in sealed containers to the Buffalo plant of the defendant and received by it.

After June 17th careful inspections of the plaintiffs' farm and farm buildings were made by the plaintiff, the veterinarians, Mr. Steere and others in a search for any object or material, other than the grain, which when eaten by the cows would have caused their sickness and death. The results of these inspections were negative.

Samples of the grain fed to the cows were afterwards submitted to a private chemist, to the then Rhode Island State College, the State Department of Health of the State of Rhode Island and the U. S. Food and Drug Administration for analysis to determine the presence therein of any poisonous substances. These tests were limited to the determination of the presence of certain specific poisons. They proved to be negative, but the results thereof did not negate the existence of other poisons for which appropriate tests were not made.

Tests of a portion of the carcasses and the stomach contents of some of the dead animals for specific poisons likewise proved to be negative.

Both Dr. Allen and Dr. Freitas, who saw and treated the plaintiffs' cows, testified that they had been poisoned. Dr. Jungherr, who appeared as an expert in behalf of the defendant, testified that in his opinion poison killed them and that the circumstances pointed to a common cause of their deaths. Sometime prior to 1950 he had been engaged by the defendant to improve the method then being used by it to sanitize feed bags after their return to the defendant's plant for refilling.

The testimony showed that prior to 1950 or 1951 the defendant had used cyanide gas to sanitize these bags. This method, Dr. Jungherr testified, had proved ineffective to destroy all bacteria which were capable of producing a death dealing toxin. This toxin was of a nature that would not be revealed either in the liver or by a culture of the blood. Dr. Jungherr further testified that as a result of his studies he recommended the discontinuance of the use of cyanide gas and the use of dielectric heat for sanitizing previously used bags. This method was found by his tests to be much more reliable. He also testified that he learned in 1950 or 1951 of the adoption of the latter process by the defendant. However, he disclaimed any personal knowledge of the exact date of the commencement of the use of the dielectric heat method.

Mr. Warren R. Flack, the director of the defendant's laboratory in charge of quality control, testified that the dielectric heat method was used after April 1, 1950, the previous method being unsatisfactory.

Listening to his testimony, which in not a few instances did not impress me, I asked him 'if the defendant had any records showing the date of the adoption of the dielectric heat method. He assured me that it did have such records. However, none were produced during the trial.

Mr. Flack admitted receiving the four samples prepared and sent by Mr. Steere to the Buffalo plant of the defendant the day after he had advised the defendant of the serious complaint being made by the plaintiffs. Despite this complaint Mr. Flack testified he made no test to determine the existence of any poisons therein. He merely made tests to determine if the samples of grain conformed to the formula for "Sweepstakes" and a microscopic examination of the samples.

The evidence further establishes that the selling price to the plaintiffs of the Sweepstakes feed was $167.60. In September, 1950, after a claim for this amount was filed with the defendant, the plaintiffs were credited with the sum of $149.60, being charged merely the sum of fifty cents each for the thirty-six bags containing the unfed grain, this being the then prevailing allowance made by the defendant to its customers for bags returned to it for refilling.

■ There being no question as to the existence of the warranty upon which plaintiffs base their action, the first question to be determined by me is—have the plaintiffs established by a fair preponderance of the credible evidence that the Sweepstakes grain was unwholesome and caused the death of the plaintiffs' cows?

■ To sustain this burden it is not necessary for the plaintiffs by appropriate evidence to exclude every other possible cause of the illness and death of their cows. It is sufficient if they have shown that the probable cause was the unwhole-someness of the grain. Monahan v. Economy Grocery Stores Corporation, 1933, 282 Mass. 548, 185 N.E. 34; Flynn v. Growers' Outlet, Inc., 1940, 307 Mass. 373, 30 N.E.2d 250.

In the instant case it is undisputed that the plaintiffs' cows were normal, healthy, productive animals prior to their being fed with the Sweepstakes grain. Plaintiffs' herd consisted of thirty-two cows and two bulls. All were quartered in the same barn; all drank the same water and all grazed in the same pasture. The fourteen that were concededly poisoned were stanchioned in the same row and were fed from the same bushel of grain taken from the lower half of one of the bags. The remaining eighteen were stalled in two rows of nine in the same barn, were fed from grain taken from the upper half of the bag and suffered no ill effects. They were subject to the same atmospheric conditions as were the fourteen who died. The two bulls, although kept in stalls at the end of the row of fourteen, were not fed any grain and did not become ill.

I am satisfied that Mr. Peckham's testimony as to the feeding practice employed on June 16th was true and that the cows were fed the quantities and in the manner which he related.

Here we see a sudden onset of a fatal illness striking the fourteen cows within a few hours following their consumption of the grain—an illness which the experts for both the plaintiffs and defendant agree was due to poisoning which caused the death of all fourteen within a 'few days.

While it is true that certain tests were made for the presence of poisons, these tests were for specific poisons. The fact that they were negative did not establish the non-existence of other poisons. In this connection the failure of the defendant to make tests for poisons in the samples sent to its laboratory by Mr. Steere is significant in my mind. While I am not convinced that the defendant installed its purportedly superior method of sanitizing used bags on April 1, 1950, I am satisfied that the defendant knew prior

to June 1950, that its method of sanitizing used bags had been inefficient. I am also satisfied that it had experienced difficulties in cleansing the bags with resultant complaints from customers. I am likewise satisfied that bacteriological tests made by it prior to 1950 showed that its then method of sanitizing used bags permitted toxin creating bacteria to remain in the bags which were refilled. Cognizant of these facts, the defendant must have known what to seek in the samples sent from the plaintiffs' farm. Yet Mr. Flack refrained from making any tests for the existence of poisons. He contented himself with making an analysis to determine if the samples conformed to the defendant's formula. And this failure to test for poisons followed, to use the words of Mr. Steere, after the plaintiff Peckham had "made a serious complaint", and after he had learned plaintiffs' cows were dead or were dying unnatural deaths. I am convinced the defendant made no analysis for poisons because from its previous experience it anticipated what the analysis would reveal—the presence of toxin produced by the non-removal of the bacteria described by Dr. Jungherr.

During the trial the defendant suggested certain other factors as possible causes of the poisoning of the cows. I have carefully considered all of them and find them most improbable and purely speculative.

■ In this case it is undisputed that plaintiffs' entire herd was kept under the same conditions, used the same pasture and drank the same water. The only cows that were stricken with a similar illness, displaying the same symptoms, admittedly those of poisoning, were the fourteen who were fed from the second bushel of grain taken from a particular bag. Their common experience warrants the inference that the grain was unwholesome and was the cause of their deaths. Johnson v. Kanavos, 296 Mass. 373, 6 N.E.2d 434. At page 436 of 6 N.E.2d of its opinion the Court there states the rule in the following manner:

"When, under the same conditions, several persons who have eaten the same food become similarly ill an inference may be warranted that the food which all had eaten was unwholesome and was the cause of their illness. Baxter v. Doe, 142 Mass. 558, 561, 8 N.E. 415; Commonwealth v. Kennedy, 170 Mass. 18, 23, 48 N.E. 770; Wigmore, Evidence (2d Ed.) §§ 442, 447. A contrary inference might be warranted if only one of several persons partaking of the same kind of food thereafter became sick. Landfield v. Albiani Lunch Co., 268 Mass. 528, 530, 168 N.E. 160; Gracey v. Waldorf System, Inc., 251 Mass. 76, 78, 146 N.E. 232. Physicians who had treated the plaintiffs and were called as witnesses by them did not testify that in their opinion the illness of their patients was caused by eating frankfurt sandwiches. The absence of such testimony did not prevent findings for the plaintiffs. We think the evidence of the common experience of the three plaintiffs on the night in question afforded an adequate basis for a finding that the food sold by the defendant was unwholesome and was the cause of the illness of the three plaintiffs. * * * "

While it is true that in Johnson v. Kanavos, supra, there was some testimony that the frankfurt tasted "off color", I do not consider that the Court there held the presence of such testimony to be essential to a recovery by the plaintiffs. And obviously any such testimony would not be available in situations involving grains or foods fed to animals. See also Haberer v. Moorman Manufacturing Co., 1950, 341 Ill.App. 521, 94 N.E. 2d 611.

■ After a careful consideration of all of the evidence, both direct and circumstantial, and the reasonable inferences to be drawn therefrom, I find that the plaintiffs' fourteen cows were poisoned as a result of the unwholesomeness of the grain supplied by the defendant and that their deaths resulted therefrom.

The remaining question to be considered by me is—the amount of damages to which the plaintiffs are entitled. Plaintiffs' cows were pure bred, pedigreed, productive Guernseys in normal health prior to their poisoning. The plaintiff Peckham has apparently enjoyed years of experience in raising and in buying and selling such cows. He estimated their fair market value to be $19,700. Mr. Henry D. Young, called by the defendant as an expert on their value, testified that their fair value was $5,575. In fairness to him it must be observed that he had never seen the plaintiffs' cows. He was frank to admit that his appraisal might have been higher if he had had the opportunity of examining them.

I am constrained to reject the valuations of both these witnesses. I think that the values set by the plaintiffs are too high, and those of Mr. Young are too low. I do not think the values assigned by Mr. Peckham to the individual cows are entirely consistent, bearing in mind their respective ages, productivity, etc. In my opinion the fair market value of the plaintiffs' cows as of June 16, 1950, was $14,300.

The plaintiffs also seek to recover the amount they claim they were obliged to expend for the purchase of milk to supply their customers until their herd was restored to its normal size and damages for the loss of business allegedly resulting from the publicity incident to the deaths of their cows. As to the first of these items, I find no basis in the evidence for its allowance. Presumably the milk so purchased was resold by the plaintiffs at a profit. There is no showing that it was not or that it could have been produced at a lesser cost by the plaintiffs. As to the second item, I believe the alleged loss of business is based purely on conjecture. Divers reasons may have prompted a particular customer to terminate his patronage. And for how long a period a particular customer might have continued as such is equally a matter of speculation.

In conclusion, the plaintiffs are entitled to the sum of $14,300 as compensation for the death of their cows together with interest at six per centum per annum since the filing of their complaint, amounting to $2,466.50. Judgment shall be entered in favor of the plaintiffs in the sum of $16,766.50.