## Richmond

SOUTHERN STATES COOPERATIVE INCORPORATED, ET AL.

V.

## A. DWIGHT DOGGETT

June 18, 1982.

Records Nos. 791160
and 791209.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson and Stephenson, JJ., and
Harrison, Retired Justice.

B. Thomas Reed; Rodham T. Delk, Jr. (William M. Harris; Taylor, Gustin, Harris, Fears & Davis; Delk and Barlow, on briefs), for appellant.

Thomas L. Woodward, Jr., for appellee.

COMPTON, J., delivered the opinion of the Court.

In this products liability suit brought on a warranty theory, the dispositive question is whether the evidence was sufficient to present a jury issue as to the defendants' liability.

In December of 1977, plaintiff A. Dwight Doggett purchased from defendant Farmers Service Company, located in Smithfield, a quantity of bagged cattle feed supplement known as "Pro-Blend 50," to be used in his commercial farming operation in Isle of Wight County. The Pro-Blend 50, a protein staple containing processed grain by-products as well as dicalcium phosphates, was manufactured by defendant Southern States Cooperative, Incorporated, at its plant in Richmond. On January 9, 1978, after the feed supplement had been consumed by plaintiff's cattle, 66 head died and a substantial number of additional head became violently ill from a poison sold under the trade name of "Thimet."

The poison, an organic phosphate, generically known as "phorate," was manufactured by "American Cyanamid," according to the evidence. Thimet is an extremely toxic compound having a strong and offensive odor, and is "widely used by farmers generally" as an insecticide and for rodent control.

In March of 1978, Doggett filed this suit against the retailer and manufacturer of Pro-Blend 50 seeking damages for the death and illness of the cattle. The plaintiff alleged that as the "direct result" of the poison being in the product, defendants had "breached the implied warranties of merchantability and fitness for the general and particular purposes for which plaintiff intended said cattle feed to be used."

Following a March 1979 trial, the jury found in favor of the plaintiff against both defendants in the amount of $24,135. The trial court, overruling defendants' post-trial motions, entered judgment on the verdict. We granted defendants appeals from the May 1979 final order.

According to settled, elementary rules of appellate procedure, we will recite the facts in the light most favorable to the plaintiff,

who is before us armed with a jury verdict approved by the trial judge.

Preparation at the farm of the food given to plaintiff's cattle on Monday, January 9, began on the preceding Saturday, January 7. At the time, plaintiff's cattle were being fed a mixture of corn, Pro-Blend 50, and peanut vines.

After having fed the cattle on that Saturday, plaintiff's son, A. Dwight Doggett, Jr., a 30-year-old college graduate who had been a farmer for eight years, prepared for the Monday feeding. On Saturday, the son placed 3000 pounds of corn in the mixing tank of an empty portable feeding mill having a capacity of 6000 pounds. The corn, stored in large, enclosed metal corn bins located adjacent to plaintiff's house, was brought to the mill by an auger conveyor extending from the bin to the mill.

After loading the corn, the son moved the mill, using a tractor, to a position adjacent to the corn bins and in front of a small barn where the Pro-Blend 50 was stored. The feed supplement had been stowed by plaintiff in the same condition as received from the retailer. The Pro-Blend 50 was sold by Southern States in sealed, 100-pound bags made of woven "plastic" cloth, technically described by the bag manufacturer as "woven polypropylene ribbon," an oil-based product. The supplement in question was from a quantity picked up by the retailer in November and December 1977 from the manufacturer and, in turn, obtained by the plaintiff from the retailer during the latter month.

Standing outside the barn door with his feet on the ground, the son reached into the barn, opened two sealed bags of Pro-Blend 50, and manually poured the contents into the "rear auger" or rear "hopper" of the feed mill. He smelled no Thimet, although he was familiar with its odor. The empty bags were left on the barn floor along with other empty bags from prior feedings.

The son then pulled the feed mill to an open shelter located near the plaintiff's house where the mill remained until early the following Monday when the feeding process was resumed. According to the evidence, the mill was not "tampered with" from Saturday to Monday, and there was no indication "directly or indirectly that anybody had introduced anything in the feed mill" during that period.

Near 7:30 a.m. on Monday, the son moved the mill from the shelter to another barn located about one-half mile from plaintiff's house where peanut vines, baled on plaintiff's farm during the pre-

vious Fall, were stored. Using a conveyor belt, the son completed filling the mixing tank of the mill, using about 20 bales of vines. The components of the mill were mixed and about 80 percent of the mixture was placed by the son in a feeder located about one-half mile from the vine barn and one mile from plaintiff's home. The mixture was "augered" from the mixing tank directly into the feeder. After placing the remainder of the food into a second feeder, the son pulled the empty mill back to the corn bins where the Saturday procedure was repeated and the mill with a mixture of corn and supplement again was parked under the shelter.

During Monday afternoon, plaintiff noticed a number of cattle in distress and some dying. Doggett and his son immediately "[ran the cattle] all off the feeders and shut them away from any more feed." Plaintiff and those who worked on his farm, assisted by many local and state officials, then began an investigation to determine the cause of the death and illness of the animals.

The local veterinarian arrived "at dark." He found several cattle dead, several dying, and others that appeared to be normal. After treating the living animals, the veterinary performed an autopsy on one at the place where it died.

During the next week, samples of the corn, the Pro-Blend 50, the peanut vines, and the feed mixture were taken from various locations pertinent to the feeding process. Subsequent laboratory analysis and expert opinion revealed that the plaintiff's loss was caused by organic phosphate poisoning. Once the chemical agent causing the death and illness of the cattle was readily identified, the investigation focused on the source of the poison ingested by the cattle.

Chemical analysis of the samples taken from the two cattle feeders, from the main chamber of the feed mill, and from the hopper at the rear of the mill where the feed supplement was introduced, all revealed quantities of Thimet, or phorate. No Thimet was discovered in samples taken from the plaintiff's corn bins or the peanut vine barn. In addition, no poison was found in samples taken from unopened and unused bags of Pro-Blend 50 situated in the plaintiff's feed barn, or from the stock of the retailer and manufacturer at their respective business locations.

On Tuesday, January 10, a Virginia Department of Agriculture inspector, who was "a little allergic to Thimet," detected the poison's "pronounced" odor at both of the feeders. During the next day, when within ten feet of the feed mill, he also smelled

Thimet. On the same day, the inspector examined a number of the empty Southern States bags that were on the floor of the feed barn and noticed the odor of Thimet in several of them.

On Monday, January 16, Herbert Jones, the County Agent for Isle of Wight, made one of his numerous trips to plaintiff's farm to assist in decontamination of the feed mill and to help in the effort to discover the source of the poison. He went to the feed storage barn and began examining the empty bags that were on the floor. While smelling inside one of the Southern States' bags, Jones noticed a "foreign odor . . . not associated with the feed." Upon closer examination, he saw a small residue in the "ears" at the bottom of the bag. This bag was forwarded by Jones to a State laboratory for analysis.

The chemists who examined the residue testified that phorate was found concentrated at the rate of about one and one-half pounds of the poison per 100 pounds of mixture. Also found in the residue were materials consistent with a feed supplement. In addition, a chemist determined the residue included "fragments of straw, peanut redskins, wood splinters, full rodent excretia and mass of fibers and string resembling those from burlap bags."

The evidence showed that Doggett had used Thimet on his farm in the past as an insecticide and for rodent control. The poison had not been employed on the premises, however, after the Spring of 1976, according to plaintiff's son, and for "four to six months prior to this [incident]," according to plaintiff.

Testimony showed Thimet was sold in 20-pound sealed bags that were packed inside a pasteboard box. After the incident in question, an empty Thimet box was found in the rear of the feed barn, a 20-by-30-foot structure. The box was about 30 feet from the bags of Pro-Blend 50 and, according to the County Agent, "had about six inches of dust on it." The evidence showed the empty box had been in the same location for "at least" ten years. There was no "active" Thimet in the box.

The plaintiff testified there was one sealed bag of Thimet on his farm at the time of the incident. It was stored with other chemicals in a structure used as a workshop, located 50 yards from the feed barn. The evidence showed the "closed" bag of Thimet was in the same condition before and after the incident. Responding to a question by plaintiff's counsel, plaintiff's son denied introducing any phorate into the feed mill.

The retailer's evidence showed that no chemicals or non-food-stuffs were picked up at the manufacturer's plant along with the quantity of Pro-Blend 50 eventually sold to plaintiff, that the feed supplement was stored in the retailer's warehouse in the sealed bags, that the supplement was sold to consumers in the original containers, and that the retailer also sold Thimet, which was kept in a location on its premises separate and apart from the Pro-Blend 50.

Southern States presented evidence describing in detail its manufacturing process which did not include the use of any phorate. It also showed that it followed "very intense" quality control procedures, that Thimet was not employed in its Richmond plant for pest control, that it never reused bags to market Pro-Blend 50, that it produces 23 different types of medicated feeds at its plant without employing Thimet, and that regular plant inspections conducted under state and federal law never disclosed the existence of phorate or Thimet on the premises.

During cross-examination, the plaintiff developed testimony to show that although the chemical Thimet was not used at the manufacturer's plant in pest control, "organo-phosphates," a poison that is "part of the general organic phosphate group," was so used there. Also, plaintiff showed that many of the components of Pro-Blend 50 came to the Southern States plant from external sources, such as farms and flour mills. Among these components are, for example, soy beans, soy bean meal, wheat middlings or bran, molasses from sugar cane processors, dicalcium phosphate, vitamin supplies, and trace mineral supplies.

In addition, plaintiff showed that during the quality control at its Richmond plant, Southern States did not "run tests there for Phorate or Thimet" in the Pro-Blend 50. The manufacturer's manager of quality control testified that because Southern States does not "use Thimet" at the plant, it did not employ the "rather complicated [testing] procedure which requires a lot of instrumentation" to test for Thimet. The same witness admitted stating in a pre-trial deposition that reused bags, if cleaned by a bag dealer, were employed on occasion by Southern States.

■ On appeal, defendants argue the plaintiff failed to establish a prima facie case. Under the granted instructions, to which there was no objection and which thus became the law of this case, the jury was permitted to fix liability against both defendants upon the same theory. The theory was that defendants breached their

implied warranty of merchantability or "fitness for the ordinary or general purposes" for which Pro-Blend 50 was sold, and that such breach was the sole proximate cause of the death and injury to plaintiff's cattle. The trial court specified that in order to recover under the warrranty theory, plaintiff must show (1) that the Pro-Blend 50 was unreasonably dangerous for the use to which it would ordinarily be put, and (2) that such condition existed when the goods left the Southern States plant. *See Logan* v. *Montgomery Ward,* 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975). *Accord, Featherall* v. *Firestone,* 219 Va. 949, 963-64, 252 S.E.2d 358, 367 (1979). Because the evidence was clear that plaintiff's loss was caused by Thimet in the feed ingested by the animals, the factual dispute was whether the poison was in the Pro-Blend 50 mixed by plaintiff's son with the other components of the cattle feed and, if so, whether such contamination was present when the feed supplement left the manufacturer's plant. We hold the proof was sufficient to make out a jury issue on these inquiries.

■ Manifestly, this is a circumstantial evidence case; and breach of warranty may be established by such evidence. Although the fact-finder is not authorized to indulge in speculation or guesswork, this does not destroy the weight of circumstantial evidence in fixing civil liability. "Proof of facts from which it can be reasonably inferred that an act or circumstance sought to be established occurred or existed is sufficient to authorize submission of the issue to the jury." *Richardson* v. *Lovvorn,* 199 Va. 688, 692-93, 101 S.E.2d 511, 514 (1958). But such circumstantial evidence must be sufficient to establish that the result alleged is a probability rather than a mere possibility. *Doane* v. *Farmers Cooperative Co.,* 250 Iowa 390, 395, 94 N.W.2d 115, 117 (1959) (seller of corn used as a cattle feed held liable for death and sickness of cattle resulting from insecticide poisoning). *See Peckham* v. *Eastern States Farmers' Exchange,* 134 F.Supp. 950 (D.R.I. 1955), *aff'd per curiam,* 234 F.2d 488 (1st Cir. 1956) (owner of dairy cows that died due to poisoning entitled to recover damages from seller of grain feed). *See generally,* Annot., "Liability of manufacturer or seller for injury caused by animal feed or medicines, crop sprays, fertilizers, insecticides, rodenticides, and similar products," 81 A.L.R.2d 138.

■ In the present case, the circumstances established by the evidence are sufficient to permit a jury reasonably to infer that Thimet was in the Pro-Blend 50 fed to plaintiff's cattle and that it

was present in the bags when the supplement in question left the manufacturer's plant. The evidence shows the following facts.

Plaintiff's son opened two, sealed bags of Pro-Blend 50 on the Saturday in question. The bags were part of a quantity of supplement manufactured at Southern States' plant and packed there in the sealed containers. The bags moved in the stream of commerce in the sealed condition to the retailer and then to the consumer where they were stowed by him in that condition.

The supplement then was poured manually from the previously unopened bags into the rear hopper of the empty feed mill to be mixed with corn. Testing showed no poison existed in the corn bins. But testing also showed a quantity of Thimet in the "ears" of one of the bags, which was found in the pile of empties where the two bags used Saturday had been thrown. And a strong odor of the poison was present in a number of these bags immediately after the occurrence. In addition, chemical analysis of samples taken from the rear hopper and the main chamber of the mill revealed quantities of phorate.*

The mixture of corn and supplement remained in the mill under a shelter from Saturday afternoon to Monday morning. There was no tampering with the mill during that period.

On Monday morning peanut vines were added to the mill. Tests showed no poison in the samples taken from the vine barn. Then the cattle were fed and became ill. Samples of the substance in the feeders showed the presence of Thimet.

If the jurors, as they were entitled to do, accepted the foregoing facts, they could reasonably infer that the cattle were poisoned because Thimet was in the Pro-Blend 50 ingested by the animals, and that it was sealed within the bags used by plaintiff's son when the containers left the manufacturer's plant.

The defendants dwell on a number of facts, some of which, if accepted by the jury, would justify a finding against the plaintiff, and others of which promote pure speculation. For example, they point to the son's failure to notice any odor of Thimet when he emptied the bags on Saturday. Also, they point to the extraneous foreign matter found in the residue of the one bag and suggest the poison "found its way into the bag by other external causes such as nest-building by a rat." Defendants also suggest that contami-

---

* The evidentiary weight to be given the analysis of these samples is somewhat diminished because presumably they were taken after the Monday feeding in question and after the mill had been partly refilled.

nation may have been due to an "accident on the farm" or because Thimet was used "carelessly around many places on the farm." These conclusions are but examples of the inferences favorable to defendants that may have been drawn from the evidence as a whole, which evidence, as we have demonstrated, supports equally compelling inferences favorable to the plaintiff. Under these circumstances the trial court did not err in submitting the case to the jury.

■ Defendants have assigned two other errors which merit only passing comment. The bag in which the residue was found was received in evidence over Southern States' objection. Even if the bag, examined by Jones a week after the incident, was not properly authenticated or identified as one of the two emptied by the son on January 7, and was thus improperly admitted, such action of the court was harmless error. Actually, introduction of the bag in evidence was unnecessary from the plaintiff's standpoint, given the detailed testimonial evidence describing the bag, its location, the residue, and the smell of Thimet about the pile of bags, all of which testimony was received without objection.

■ Finally, the trial court did not err in refusing Instruction 9A, offered by Southern States, permitting the jury to find that "one of several things" caused plaintiff's damage. The instruction was misleading under these facts because the evidence was uncontradicted that Thimet poisoning caused plaintiff's loss. The proffered instruction was also cumulative because its substance was adequately covered by numerous instructions tendered by defendants and given.

For these reasons, the judgment of the trial court will be

*Affirmed.*

COCHRAN, J., dissenting.

In my opinion, the evidence is insufficient as a matter of law to present a jury issue as to the defendants' liability for breach of an implied warranty of fitness. We have long adhered to the rule that an inference must be drawn from a fact in evidence, and not from another inference. *Kayh* v. *Commonwealth,* 219 Va. 424, 427, 247 S.E.2d 696, 698 (1978), quoting from *Doyle* v. *Commonwealth,* 212 Va. 677, 678, 187 S.E.2d 201, 202 (1972). In the present

case, however, the jury verdict approved by the trial court depends entirely upon the pyramiding of inferences.

The majority acknowledges that to create a jury issue circumstantial evidence must show an alleged result to be probable rather than merely possible. I believe that the evidence in this case falls far short of permitting any reasonable inference of probability that Doggett's feed contained poison when it left the manufacturer and the retailer.

The established facts were that Doggett owned 66 cattle which died on January 9 from eating phorate poison marketed as "Thimet," that the cattle were fed Pro-Blend 50, and that on January 16 a Pro-Blend 50 bag, lying with numerous other similar bags in the building where the feed was mixed, contained a tablespoon of debris. This debris, upon analysis, was found to include feed residue, rodent feces, peanut redskins, a bird feather, straw fragments, wood splinters, pieces of burlap (the bag itself was made of polypropylene, not burlap), and poison.

The first inference was that the condition of the bag one week after the death of the cattle proved its condition at the time it left the manufacturing plant and the retail store. Under the general rule, evidence of the existence of a condition subsequent to an event is some evidence of the condition's existence at the time of the event. But the corollary rule is equally important, that evidence of a subsequent condition is incompetent to show prior existence of the condition where "the contingencies of change were too many" for the subsequent condition to have probative value. *Butler* v. *Greenwood,* 180 Va. 456, 464, 23 S.E.2d 217, 220 (1942). Thus, in *Washington, &c. R. Co.* v. *Vaughan,* 111 Va. 785, 69 S.E. 1035 (1911), we affirmed the trial court's refusal to admit evidence that a rail car's lights were on as it operated on its route fifteen minutes after the accident.

In the present case, the evidence was uncontradicted that Thimet has a strong and distinctive odor, but Doggett, Jr., did not detect its presence when pouring the Pro-Blend 50 into the feed mill. The Department of Agriculture inspector smelled Thimet at the feeders on January 10. The next day he smelled Thimet at the feed mill and continued to smell it as he examined several empty Pro-Blend 50 bags lying about 10 feet away, but he believed that this odor came from the Thimet that he had just smelled at the feed mill rather than from the bags. Thus, while the obvious purpose of his investigaton was to determine the source of the

Thimet, the inspector did not then or thereafter take any of the bags for analysis. On January 16, the County Agent picked up four empty feed bags from a pile of "a dozen or more" and detected the odor of Thimet in one which he forwarded to the laboratory in Richmond. The evidence fails to show whether this bag, not received by the laboratory until January 31, had been on the Doggett premises for weeks, months, or years before the cattle died.

The inference that the condition of the contaminated feed bag one week after the accident was probative of its condition when it left the plant and the store depended upon three other inferences. First, the jury was permitted to infer that the bag was the same used by Doggett, Jr., in mixing the feed on January 7 and feeding cattle on January 9, although neither he nor anyone else ever identified the bag as the same.

Second, the jury had to infer that no intervening cause changed the condition of the bag. The probability that the bag's condition continued unchanged from the time it was opened depends "on the nature of the specific fact and the circumstances of [the] case." *Butler*, 180 Va. at 464, 23 S.E.2d at 220. The evidence in the present case negated the reasonableness of any inference that the bag's condition remained unchanged after opening. When discovered a full week after the accident, the bag was one of many bags lying on the floor, and its contents, except the feed residue, were inconsistent with the usual contents of Pro-Blend 50 bags. Indeed, no other bags of Pro-Blend were found to contain any Thimet, although Doggett submitted a sample of feed from a bag that he reported had been used by his son in the fatal feeding operation.

Third, the jury had to infer that the bag contained at some point sufficient poison to kill 66 cattle. Doggett's expert testified that the poison concentration in the tablespoon of debris found in the bag was 1.46%. Then assuming an even mixture of 1.46% in a 100-pound bag, he calculated that the full bag would have contained a lethal concentration of approximately one and one-half pounds of poison. (The evidence of Southern States was that it was impossible in the manufacturing process for Thimet to have been packed in a Pro-Blend 50 bag, and in any event, impossible for one and one-half pounds of any foreign substance to have been packed in one bag without a similar quantity being injected into 39 other bags packed automatically at the same time).

In my opinion, this leap from inference to inference to inference to inference, while impressive as a display of mental agility, cannot be justified. The jury should not have been permitted to reach a verdict based upon speculation, sympathy, and quadruple inferences.

Moreover, while it may be arguable that Instruction 9A, proffered by Southern States and refused by the trial court, was unnecessary, I do not agree that it was misleading. It is true, as the majority states, that there was no doubt that Thimet in the feed killed the cattle. But that does not justify refusing an instruction expressing the Southern States theory that there were many ways, for some of which Southern States was not responsible, that the Thimet could have been introduced into the feed. For an obvious example, the Thimet could have been poured from a Thimet container into the Doggett feed mill accidentally by one of Doggett's employees. There was evidence of the presence on the premises of two Thimet containers, one an empty box near the feed mill, and the other an unopened bag in another building. Doggett admitted that he had used Thimet to control rodents within four to six months prior to the accident.

I would reverse the judgment of the trial court and enter judgment for Southern States and Farmers Service.

HARRISON, R.J., joins in dissent.