# COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Causey and Friedman
Argued at Norfolk, Virginia

ANTHONETTE JASCO

                                        MEMORANDUM OPINION[*] BY
v.        Record No. 0704-22-1         JUDGE DORIS HENDERSON CAUSEY
                                                APRIL 2, 2024

VANN-VIRGINIA CENTER
 FOR ORTHOPAEDICS, P.C., d/b/a
 ATLANTIC ORTHOPAEDIC SPECIALISTS, ET AL.

### FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

Christopher T. Holinger (Mary T. Morgan; James P. St. Clair;
Golightly Mulligan & Morgan, PLC; Norris & St. Clair, P.C., on
briefs), for appellant.

A. William Charters (C. Thea Pitzen; Jeffrey S. Kiser; Goodman
Allen Donnelly, PLLC, on brief), for appellees.


After a five-day trial in the Circuit Court for the City of Norfolk, the jury returned its verdict against Lawrence Shall, M.D. and his employer, Vann-Virginia Center for Orthopaedics, P.C. ("Atlantic Ortho"), for his negligent failure to diagnose and treat a knee injury suffered by the appellant, Anthonette Jasco. Finding that the jury's verdict was without evidence to support part of Jasco's claim, the circuit court set aside the damage verdict and reduced the award. Jasco accepted remittitur under protest and appealed to this Court for review. Dr. Shall and Atlantic Ortho (collectively, appellees), in turn, argue that the evidence is insufficient to support an award of damages and challenge the circuit court's decision to admit Jasco's expert evidence. For the reasons below, we affirm in part and reverse in part.

---

[*] This opinion is not designated for publication. *See* Code § 17.1 413(A).

BACKGROUND[1]

In February 2018, Jasco fell at work injuring her right wrist and right leg. Urgent care diagnosed her with a wrist fracture. She was referred to appellees for further treatment, four days later, she was evaluated by Dr. Shall. He examined her wrist and leg. Dr. Shall observed swelling below her knee but found only soft tissue injuries. He performed surgery to repair Jasco's fractured wrist two days later.

After the wrist operation, Jasco continued to experience pain and weakness in her right leg. The swelling had also not subsided. She went to her primary care physician twice to complain about these symptoms. Her doctor referred Jasco to a physical therapist, who directed her back to primary care for knee x-rays after she continued to walk abnormally following weeks of physical therapy treatment.

The x-rays revealed that Jasco had a severe tibial plateau fracture likely sustained in her fall some 43 days earlier. Blake Moore, M.D. evaluated Jasco and performed the surgery needed to repair her knee. According to Dr. Moore, the complexity of the fracture, together with the delay in its diagnosis, were contributing factors to a longer than usual surgery. The complexity of the fracture required tracing of the peroneal nerve during surgery, which would have been necessary even without the delay. He considered the surgery mostly successful, noting improvement in both Jasco's hyperextension and a valgus deformity (misalignment) that had been significant before the operation. The valgus following surgery was noted as slight. He later opined that only a total knee replacement could completely correct the valgus.

In a post-operative examination at the end of April, Dr. Moore observed fluid draining from Jasco's incision. He prescribed oral antibiotics and instructed her to change the dressing on

[1] "When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003).

her knee twice a day for the rest of the week. He also asked her to come back for a reassessment. When she did, Jasco had an infection in her knee that urgently required surgery. She underwent surgery immediately and again a few days later. She remained hospitalized between surgeries and had six weeks of intravenous antibiotics during her recovery.

Jasco returned for more follow-up visits in June and July. By then, the swelling in her knee had completely abated. She could bear weight and was even able to stand on one leg. She went back to work in October 2018, having been unable to do so since April. But her valgus is permanent, and she testified that her knee continues to bother her daily. Dr. Moore explained that a patient has "valgus" when the knee is "cocked out to the side." He went on to explain that Jasco was "walking funny because her knee hurts."

In 2019, Jasco filed a medical malpractice lawsuit against appellees, alleging that Dr. Shall and, vicariously, Atlantic Ortho were negligent in failing to properly diagnose and treat her knee injury, which resulted in complex surgery, infection, pain and suffering, permanent disability, and an increased risk of future infection. She also alleged that she would continue to incur medical expenses, endure pain and suffering, and disability. She sought two million dollars in damages.

Jasco designated Thomas H. Sanders, M.D., an orthopedic surgeon, as an expert witness on standard of care. At trial, Dr. Sanders testified that appellees breached the standard of care by failing to immediately diagnose Jasco's knee injury. He opined that her fracture required surgery within seven to ten days and that after fourteen days, it becomes much harder for surgeons to put the bones back together correctly. He testified that Jasco's protracted surgery and recovery was, at least in part, due to her bones starting to heal out of place. He testified that the delay increased her risk of arthritis.

Dr. Sanders was the only witness to testify about causation. He explained that the risk of getting an infection increases the longer the patient is in surgery and opined that "the extra time that [Jasco] spent having her fracture fixed significantly increased her risk and that that was the cause of her infection." He testified that he could not predict whether Jasco would have experienced an infection had the delay in seeking treatment or the reparative operation been shorter.

The jury returned a verdict in Jasco's favor and awarded her $530,000 in compensatory damages. The circuit court entered an order setting aside the jury's verdict on damages. The court found that Jasco's damages mostly derived from her infection and that her other complaints—the residual valgus deformity, pain and suffering, and lost wages—were not as serious. The court also found that there was no evidence that the delay in diagnosing her fracture proximately caused the infection. Concluding that evidence about the infection had a material effect on the jury's decision about damages, the court reduced the award to $50,000. Jasco accepted the judgment under protest. This appeal follows.

ANALYSIS

I. Scope of Expert Testimony

Appellees argue that the circuit court erred in "[p]ermitt[ing Dr. Sanders] to [g]ive [o]pinions as to [c]ausation and [d]amages [w]hen [h]e [w]as [p]roffered as an [e]xpert [s]olely on the [s]tandard of [c]are." We disagree because Jasco's expert designation, disclosed over a year before trial began, allowed appellees to discover Dr. Sanders's opinion in preparation for trial.

We "appl[y] an 'abuse of discretion standard when reviewing a trial court's decision to admit expert opinion testimony.'" *Online Res. Corp. v. Lawlor*, 285 Va. 40, 59 (2013) (quoting *CNH Am. LLC v. Smith*, 281 Va. 60, 66 (2011)). Appellees argue that "[t]he scope of expert

- 4 -

testimony at trial is limited, in part, by the topics on which the expert is proffered," citing *Dixon v. Sublett*, 295 Va. 60 (2018), for this proposition. However, *Dixon* does not stand for this proposition—the admission or exclusion of expert testimony was not at issue in *Dixon*. *See generally Dixon*, 295 Va. 60. Appellees do not provide any other support for this proposition. Virginia law instead provides that we evaluate whether expert testimony on a certain topic is admissible under Rule 4:1(b)(4)(A)(i).

Rule 4:1(b)(4)(A)(i) provides that:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

"When applying Rule 4:1(b)(4)(A)(i), this Court begins by 'determining whether the opinion at issue was disclosed in any form.'" *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 576 (2011) (quoting *John Crane, Inc. v. Jones*, 274 Va. 581, 591 (2007)). "[T]he purpose of Rule 4:1(b)(4)(A)(i) . . . is to 'allow the litigants to discover the expert witnesses' opinions in preparation for trial.'" *Id.* (quoting *Woodbury v. Courtney*, 239 Va. 651, 654 (1990)).

In *Condominium Services, Inc.*, the Court held that an expert's testimony was properly admitted because it was adequately disclosed under Rule 4:1(b)(4)(A)(i). The Court held that the plaintiff's expert was permitted to testify as to the amount of tax-related damages the plaintiff suffered due to the defendant's failures because the plaintiff's expert designation adequately disclosed the expert's opinion. *Id.* at 575-76. The expert disclosure provided that:

> [The expert] will opine that the failures of [the defendant] resulted in the underpayment of taxes and that the [plaintiff] will now incur interest and penalties as a result of the failures of [the defendant] as well as expenses in the form of fees paid to [the

expert]'s firm to correct the errors of [the defendant] and to resolve the claims of the IRS and the Commonwealth of Virginia. . . .

[The expert]'s opinions are based upon his experience and expertise, his review of correspondence between the IRS and the Commonwealth of Virginia and the [plaintiff], his review of W-2s, general ledgers, and other financial documents of the [plaintiff] relating to payroll withholdings and payment of payroll taxes.

*Id.* at 576.

Here, as in *Condominium Services, Inc.*, Dr. Sanders's opinion on causation of Jasco's injuries was properly admitted because it was adequately disclosed under Rule 4:1(b)(4)(A)(i). Jasco filed the disclosure with the circuit court and served it on appellees in October 2020, over a year before the trial began in November 2021. This designation provides that:

Dr. Sanders is an orthopedic surgeon in private practice with the Centers for Advanced Orthopedics in Falls Church, Virginia. He is board certified in orthopedic surgery and a copy of his curriculum vitae is attached.

Dr. Sanders will testify generally regarding the care and treatment provided to plaintiff by defendants, Vann-Virginia Center for Orthopaedics, P.C. d/b/a Atlantic Orthopaedic Specialists, Lawrence M. Shall, M.D. and Chad R. Manke, M.D., and others as well as the general medical treatment and anatomic issues pertinent to this case including, but not limited to, evaluation of complaints related to ankle pain, leg pain, knee pain, swelling and similar orthopaedic issues, the options available for such issues and the procedures performed on plaintiff and the complications associated with each. Specifically, he will address issues of standard of care, causation, and damages. He has reviewed the Complaint, the pleadings, Answers to written discovery, available deposition transcripts in this case, as well as the plaintiff's medical records and all available radiology. He will continue to review available records, pleadings, and deposition transcripts as they become available. All of his opinions will be to a reasonable degree of medical probability.

Dr. Sanders is expected to testify that defendants' care and treatment of plaintiff did not comply with the standard of care and that the defendants' negligence resulted in injury and/or harm to the plaintiff. All resulting treatment and bills were reasonable, necessary and a result of the defendants' negligence.

- 6 -

The expert designation also includes four lengthy paragraphs detailing the specifics of Dr. Sanders's opinion on how appellees breached the standard of care and how this breach caused Jasco's injuries. These paragraphs include discussion about how "the delay in diagnosis of . . . Jasco's tibial plateau fracture[] resulted in a complex extended surgery and increased her risk of wound healing and infection" and the reasons why this is the case. One such reason is that "[t]he longer the surgery the greater likelihood of a surgical site infection." In addition, the designation discloses that Dr. Sanders's opinion was that "[t]o a reasonable degree of medical probability, the failure to diagnose and treat extended [Jasco's] recovery, caused her increased pain during rehabilitation, and delayed her return to employment (loss of income)."

The circuit court found that the expert designation gave appellees "fair notice" of the substance of Dr. Sanders's testimony. We agree with the circuit court and conclude that this disclosure adequately allowed appellees to discover Dr. Sanders's opinions on causation and damages in preparation for trial, in satisfaction of Rule 4:1(b)(4)(A)(i). Thus, the circuit court did not err in allowing Dr. Sanders to testify about causation and damages.

## II. Sufficiency of Evidence to Establish Proximate Cause

"A trial court may set aside a jury verdict and enter final judgment only when the verdict is plainly wrong or without credible evidence to support it." *Fobbs v. Webb Bldg. Ltd. P'ship*, 232 Va. 227, 229 (1986); *see also* Code § 8.01-680. The record supports the circuit court's conclusion about proximate cause as well as its finding that appellees are liable for only some of Jasco's damages. Thus, we agree with the circuit court's decision to set aside the verdict.[2]

There is insufficient evidence to support a finding that appellees proximately caused Jasco's infection. Yet, the record supports her claim that appellees' failure to promptly diagnose her knee fracture proximately caused some degree of her injury and damages.

---

[2] Because we affirm the circuit court, we do not reach appellees' fifth assignment of error.

- 7 -

To prevail in an action for medical malpractice, a plaintiff must establish (1) the standard of care; (2) breach of the standard of care; and (3) that the defendant's breach of the standard of care proximately caused [her] injuries. *Bitar v. Rahman*, 272 Va. 130, 137-38 (2006). Appellees concede that Dr. Shall breached the standard of care owed to Jasco. The pivotal issue here is proximate cause.

Proximate cause is "an act or omission that, in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred." *Williams v. Joynes*, 278 Va. 57, 62 (2009). In Virginia, the proximate cause element has two components: causation-in-fact and causation-in-law. *Pergolizzi v. Bowman*, 76 Va. App. 310, 339 (2022). The plaintiff bears the burden of proving proximate cause by a preponderance of the evidence. *Honsinger v. Egan*, 266 Va. 269, 276 (2003). Proximate causation is ordinarily a question of fact for the jury. *See Atkinson v. Scheer*, 256 Va. 448, 453 (1998). But when reasonable minds could not differ, a court may resolve the issue. *Id.* at 454.

"Causation-in-fact" exists when there is a reasonable connection between the defendant's negligence and the plaintiff's damages. *Pergolizzi*, 76 Va. App. at 339. Plaintiffs have historically established this component by proving that the injury would not have occurred "but for" the defendant's negligence, *id.*, or less often, by showing that it is more likely than not the defendant's negligence caused the injury. *See, e.g.*, *Hadeed v. Medic-24, Ltd.*, 237 Va. 277, 287 (1989) (holding that a jury could reasonably conclude that with bypass surgery, the decedent would have had an 85-90% chance of living to age 70).

"Causation-in-law" describes foreseeability. *Pergolizzi*, 76 Va. App. at 339. Even if there is a factual connection between a defendant's act and a plaintiff's injury, the defendant is liable only if the injury is foreseeable. *Id.* A plaintiff's injury is foreseeable if it is the "natural and probable" result of the defendant's breach. *AES Corp. v. Steadfast Ins. Co.*, 283 Va. 609,

- 8 -

621 (2012). The emphasis of this component of proximate cause is reasonableness. "Proof of 'possibility' of causal connection is not sufficient." *Wilkins v. Sibley*, 205 Va. 171, 175 (1964). A negligent defendant is not liable for remote harms that are possible but "wholly improbable." *Norfolk Shipbuilding & Drydock v. Scovel*, 240 Va. 472, 475 (1990). Put differently, "reasonable foreseeability is sufficient; clairvoyance is not required." *Va. Elec. & Power Co. v. Winesett*, 225 Va. 459, 468 (1983).

If causation is at issue in a medical malpractice case, expert testimony is ordinarily required. *Raines v. Lutz*, 231 Va. 110, 113 (1986). As discussed above in the context of admissibility, a medical expert's testimony "must be rendered to a 'reasonable degree of medical probability.'" *Bitar*, 272 Va. at 138 (quoting *Pettus v. Gottfried*, 269 Va. 69, 78 (2005)). Material facts may be established by circumstantial evidence. *S. States Coop. v. Doggett*, 223 Va. 650, 657 (1982). But when there is no direct proof of proximate causation, "the circumstantial evidence must be sufficient to show that the causation alleged is 'a probability rather than a mere possibility.'" *Bussey v. E.S.C. Rests., Inc.*, 270 Va. 531, 536 (2005) (quoting *Doggett*, 223 Va. at 657).

Here, there is credible evidence that a prompt diagnosis would have led to a better outcome for Jasco. The record supports her claim that appellees' failure to exercise reasonable and ordinary medical care proximately caused a delay in surgical correction of the fracture, contributed to her post-operative knee valgus, pre-operative and post-operative discomfort, and lost wages. A rational jury could reasonably find that these damages were a consequence that would not have occurred but for appellees' negligence.

Jasco testified that her knee continues to bother her and that she would do "anything to get it to stop hurting every day." She said that her knee soreness affects her ability to walk and that her discomfort is particularly troubling in the mornings and when it rains. She testified to

having none of these problems before the accident and described the quality of her life since then as "really bad."

Jasco also testified about the difficulties she experienced before learning that she needed surgery and during her post-operative recovery. Weeks after the accident, her leg remained inexplicably swollen, leaving her immobile. She said that she could not go to work although she tried. She testified that she went unpaid when she did not work and that she hired a substitute to cover her job responsibilities while she recuperated.

Jasco's primary care physician testified about Jasco's pre-accident medical history. He said that Jasco suffered from various ailments including chronic pain, rheumatoid arthritis, and fibromyalgia. However, he gave no indication that she had valgus in her right knee before she fell at work.

The surgeon that performed the operation on Jasco's knee, Dr. Moore, testified that when he first saw her, her knee was significantly crooked. He explained that after the surgery, Jasco's knee alignment had improved but was not anatomically perfect. He also testified that short of total knee replacement, the valgus was likely a permanent condition.

Dr. Sanders testified that, under the appropriate standard of care, appellees should have immediately diagnosed Jasco's knee fracture and performed surgery within seven to ten days. He described how Jasco's bones had likely started to heal in a displaced position, which contributed to a longer and more complicated procedure with an extended surgery time. He further opined that the delay increased her risk of arthritis, and likely caused a more difficult and painful recovery.

Based on this evidence and its permissible inferences, a rational jury could reasonably conclude that: Jasco had a longer period of discomfort—43 days—before the diagnosis; the surgery was more complicated than it would have been without the delay; Jasco suffered a longer

and more painful post-operative convalescence than necessary; Jasco has a permanent deformity—valgus. She claims to now suffer a "very bad" quality of life due to valgus and her knee pain. These claims could all reasonably be attributed to appellees' deviation from the standard of care and deemed a natural and probable result of that breach. She would thus have a right to pursue damages for her knee valgus, pain and suffering, and lost wages.

Unlike Jasco's other claims, nothing in the record shows that the delayed diagnosis proximately caused her infection. Dr. Sanders testified that a patient's risk of infection generally increases with surgery time and that the delay in Jasco's diagnosis and surgery substantially increased her risk. Whether the substantial risk increase made her infection probable rather than merely possible was left to speculation. In other words, Dr. Sanders did not say with a reasonable degree of medical probability that the late diagnosis made the surgery so risky that it probably caused Jasco's infection.

When asked what the increased risk of infection would be if the surgery had occurred in thirty days, he responded

> [F]ixing a fracture at Day 0 versus Day 30 is more difficult. I can't tell you whether [Jasco] would have had an infection or not, but fixing it at 30 days does lead to an increased operative time; so[,] her relative risk would have been elevated. I cannot predict what her outcome would have been.

When asked whether Jasco risked a greater than fifty percent chance of infection after a fifty-day delay until surgery, he similarly answered, "I can't tell you what would have happened if she was fixed at 50 days." Dr. Sanders did not have to identify with total certainty the precise moment the infection occurred, but he could not confirm whether Jasco's increased surgery time contributed to her infection in any way. Without that confirmation, the testimony does not establish proximate cause between appellees' breach in the standard of care and Jasco's

infection. There is no "but for" or "more likely than not" causal relationship between the two events.[3]

The proximate cause of Jasco's infection lies in "the realm of speculation and conjecture." *Blacka v. James*, 205 Va. 646, 650 (1964). Jasco's only evidence of causation—Dr. Sanders's testimony—did not establish that appellees' negligence either was the "but for" cause of her infection or made the infection more likely than not to occur.[4] The jury could only guess how much the delayed diagnosis caused her infection—if at all. Given the lack of evidence to support Jasco's infection claim, it was within the circuit court's authority to set aside the verdict.

### III. The Circuit Court's Decision to Set Aside the Damage Award

A trial court's decision to set aside a verdict as excessive is subject to review for abuse of discretion. *See Poulston v. Rock*, 251 Va. 254, 258-59 (1996). We consider the evidence "in the light most favorable to the party that received the jury verdict." *Baldwin v. McConnell*, 273 Va. 650, 655 (2007) (quoting *Shepard v. Cap. Foundry of Va.*, 262 Va. 715, 721 (2001)). Here, that party is Jasco. The record supports part of Jasco's claims for damages, but her failure to establish that appellees proximately caused her infection justified the circuit court's decision to reduce the award. Even so, we conclude that the court erred in fixing the amount of the reduced jury award.

---

[3] Because we hold that the evidence does not support a finding of a factual connection between her infection and appellees' negligence, we do not address whether there is evidence that the infection was reasonably foreseeable.

[4] Jasco contends that "[t]he trial court erred by concluding that Appellees' objection to [the admissibility of] Dr. Sanders' opinion regarding the cause of Appellant's infection was timely made." We need not address this contention, because—regardless of its admissibility—the problem for Jasco concerns the sufficiency of Dr. Sanders's testimony in establishing the proximate cause of Jasco's infection. Even taking Dr. Sanders's testimony as admissible and accurate, it is insufficient to establish causation with respect to the infection.

A trial court generally has discretion to modify a jury's award. *See Poulston*, 251 Va. at 258-59 (explaining that "a jury verdict is not beyond the control of" the trial court). Where a verdict shocks the court's conscience, such that it suggests "passion, corruption, or prejudice; that the jury has misconceived or misunderstood the facts of the law; or, the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision[,]" the court may then order a remittitur. *Id.* at 258. Under such circumstances, the trial court may either decide the case upon the merits, if sufficient evidence exists before the court to do so, or empanel another jury for a trial exclusively regarding damages. *See* Code § 8.01-430. To uphold a remittitur order, we must have available in the record both the trial court's conclusion that the verdict was excessive and the trial court's analysis demonstrating that it considered factors in evidence relevant to a reasoned evaluation of the damages when drawing that conclusion; then, we must determine whether the remitted award is "reasonabl[y] relat[ed] to the damages disclosed by the evidence." *Poulston*, 251 Va. at 259. Ultimately, "'[r]easonableness' . . . is the standard by which the exercise of discretion must be tested in this Court." *Bassett Furniture Indus. v. McReynolds*, 216 Va. 897, 912 (1976).

The circuit court committed error when it allowed the jury to consider liability and damages relating to Jasco's infection. However, it corrected this error when it noted that the jury had no evidence from which it could have reasonably determined when or how the infectious agent had entered Jasco's body, let alone whether the delay in Jasco's diagnosis had caused the infection. In an attempt to remedy the fact that damages were likely awarded for a claim that was not proven, the circuit court correctly decided to reduce the award—but we hold that the court improperly chose the amount of $50,000.

Jasco claimed three items of damages: first, the infection to her knee, and the associated pain, suffering, and medical expenses that came with it; second, the delay in her diagnosis, the

deformity, and pain and suffering associated with it; and third, her lost wages, totaling $3,000. In the face of a $530,000 award, the trial judge chose to reduce that award by $480,000 on the grounds that "[t]he infection, and its attendant surgeries, hospitalization, and medical expenses, was the plaintiff's principal item of damages" and that all the rest were "minor complaints." Specifically, as to deformity, pain, and suffering associated with the delay in Jasco's diagnosis, the circuit court asserted that most or all of the pain ended when surgery was finally performed and that Jasco has continued to experience "discomfort" when it rains. In contrast, the record shows that Jasco's testimony went further—describing her pain as daily, not just when it rains, and that her resulting quality of life is "very bad."

As stated above, "[a] trial court may set aside a jury verdict and enter final judgment only when the verdict is plainly wrong or without credible evidence to support it." *Fobbs*, 232 Va. at 229; *see also* Code § 8.01-680. As we hold above, no credible evidence supports the jury's verdict as to the infection item of damages. However, credible evidence—Jasco's testimony— supports the jury's verdict related to the delay-in-diagnosis and lost-wages items of damages. Thus, the circuit court erred in finding that most of Jasco's pain ended after the surgery was performed. As the record shows that this erroneous factual finding factored into the circuit court's analysis when fashioning the new award of damages, we hold that the circuit court abused its discretion in assigning a $50,000 figure to the damage award.

Although deference is owed to the factual determinations of a circuit court because it "saw and heard the witnesses while we are confined to the printed record," *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 300 (1987), the circuit order's order was inconsistent with the evidence available in the record. Notably, the circuit court did not have full access to the trial transcript at the time of its own order. Specifically, the circuit court stated that

- 14 -

a transcript of Jasco's testimony was not provided and the court was operating on its own "recollection" of the evidence.

As to deformity, pain, and suffering associated with the delay in Jasco's diagnosis, the circuit court asserted that most or all of the pain ended when surgery was finally performed, after a delay of fewer than two months. However, the transcript, viewed in the light most favorable to Jasco, reveals that Jasco's testimony went further—describing her pain as daily, not just when it rains, and that her resulting quality of life is "very bad."

Again, the court correctly concluded that the evidence establishing liability for the infection was insufficient—and earnestly sought to resolve the resulting damages issue post-trial. It did so without the aid of the transcript, however. The fact that the circuit court, working from memory, failed to consider certain pieces of evidence relating to Jasco's condition not only means that some "factors in evidence relevant to a reasoned evaluation of the damages" were missed, but also that the court could not have viewed the evidence in the "light most favorable" to Jasco. *Poulston*, 251 Va. at 259; *Baldwin*, 273 Va. at 655 (quoting *Shepard*, 262 Va. at 721). As such, we reverse the circuit court's remittitur and remand the case to the circuit court for a retrial on damages.

## CONCLUSION

The circuit court did not err in allowing Dr. Sanders to testify about causation and damages because his opinions were adequately disclosed in Jasco's expert witness designation. We agree with the circuit court that there was insufficient evidence in the record to support an award of damages for Jasco's suffering related to her infection. However, on this record, the circuit court abused its discretion in fashioning the award of damages of $50,000. Thus, we reverse the remittitur and remand the case for a new trial on damages.

*Affirmed in part, reversed in part, and remanded.*

- 15 -